STATE *v.* ELVA GREAVES.

October Term, 1941.

Present: MOULTON, C. J., SHERBURNE, BUTTLES, STURTEVANT and JEFFORDS, JJ.

Opinion filed November 4, 1941.

223

*Edward G. McClallen, Jr., Joseph F. Rutherford* and *Hayden C. Covington* for respondent.

*Waldo C. Holden, amicus curiae,* for American Civil Liberties Union.

*Robert T. Stafford,* Grand Juror of the City of Rutland, for the State.

STURTEVANT, J.   This is a criminal case in which the respondent, Elva Greaves, is charged with a violation of section 22 of chapter 21 of the Rutland City ordinances as amended.   Briefly stated, the offense alleged is that on, to wit, the 19th day of April, 1941, at the City of Rutland, the respondent did "carry on the business of 'peddler' by selling pamphlets for money without obtaining a license from said City of Rutland so to do, * * * ." Trial was by jury in the Rutland Municipal Court, a verdict of

224

guilty returned, judgment entered thereon and the case is here upon exceptions by the respondent.

The parts of the ordinance in question which are here material are as follows: "No person shall carry on the business of * * * peddler * * * within the City, * * * without first obtaining a license therefor as provided in this chapter, * * * ."

The respondent at the close of the State's case moved for a directed verdict of "not guilty," which motion was denied. This was renewed at the close of all the evidence and exceptions saved to the court's refusal to grant it. The defendant also seasonably moved to set the verdict aside and saved exceptions to the court's refusal to do so.

The respondent's motion for a directed verdict was upon the grounds that she was not a peddler but did disseminate teachings of the Bible by distributing books, booklets, pamphlets and magazines for which she received money contributions; that the undisputed evidence shows that she is not guilty and also upon the grounds that the ordinance in question as applied to her is contrary to the provisions of both the Federal and State Constitutions in that she has thereby been deprived of her rights as to freedom of speech, freedom of press and freedom of right to worship Almighty God.

In considering this motion we must view the evidence in the light most favorable to the State. *State* v. *Gaffney and Fields*, 56 Vt. 451, 453. So considered it would justify a jury in finding the following facts.

The respondent is an ordained minister of a sect or class known and designated as "Jehovah's Witnesses." As such she believes that she is commanded by the Almighty to spread the Gospel as she and other members of this organization believe it to be and that it is her duty to do so. She did this by publicly taking positions on the sidewalks and streets in the City of Rutland, equipped with a magazine bag and several magazines known as the "Watchtower" and "Consolation." As people passed she would call out some statement referring to religion and if any person gave attention and wished a magazine she sold it to him for five cents which was no more than enough to cover the cost of publishing same. She sold several of these in this manner on the day mentioned in the complaint. The object of this distribution of magazines was to place in the hands of the

people in general true Biblical teachings as she understands them and believes them to be and not for the purpose of any financial gain or material personal benefit whatsoever. She had no license from the City of Rutland to carry on therein the business of peddler.

Section 24 of this ordinance provides that the fee for a peddler's license shall be from $10. to $200., depending upon the manner of travel of the applicant and the capacity of the vehicle used to transport the goods he desires to sell.

There is no claim that the printed matter in the magazines in question was obscene or otherwise objectionable.

The respondent has briefed two exceptions to the failure of the court to grant her motion for a directed verdict. These are: 1. That the undisputed evidence showed that she was not guilty because she was not a peddler but was a preacher. 2. That the ordinance as construed and applied deprived her of her right of freedom of speech, press and worship, contrary to the first and fourteenth amendments to the United States Constitution.

The first exception states no grounds why a person may not be both a peddler and a preacher. It is, therefore, too general to receive consideration here and we give this no further attention. *State* v. *Malnati,* 109 Vt. 429, 431, 199 Atl. 249.

2. The First and Fourteenth Amendments to the United States Constitution are, in part, as follows:

> ''Article I. Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.''

> ''Article XIV. Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.''

■ Whether the license fee with which we are concerned is considered as a license fee or a license tax, its effect upon circulation of these magazines is the same in either case. In considering the constitutional question here this ordinance must be tested by its operation and effect rather than by its form. *Near* v. *State of Minnesota*, 283 U. S. 697, 708, 57 Sup. Ct. 625, 75 L. Ed. 1357; *Henderson et al.* v. *Mayor of N. Y. et al.*, 92 U. S. 259, 268, 23 L. Ed. 543. Therefore what is stated by the United States Supreme Court in the case of *Grosjean* v. *American Press Company*, 297 U. S. 233, 80 L. Ed. 660, 56 Sup. Ct. 444, has great weight in determining the question in the case at bar. In that case the Court was considering the validity of a Louisiana statute which provided ''that every person, firm, association or corporation, domestic or foreign, engaged in the business of selling, or making any charge for, advertising or for advertisements, whether printed or published or to be printed or published, in any newspaper, magazine, periodical or publication whatever, having a circulation of more than 20,000 copies per week, or displayed and exhibited, or to be displayed and exhibited, by means of moving pictures, in the State of Louisiana, shall, in addition to all other taxes and licenses levied and assessed in this State, pay a license tax for the privilege of engaging in such business in this State of two per cent. (2%) of the gross receipts of such business.'' The question before the Court was whether such tax violated the provisions of the First and Fourteenth Amendments to the United States Constitution. The Court in the opinion in that case reviews the history of the long struggle which took place in England between the Government and the proponents of a free press. The two evils which were used to control the press there were censorship and taxation. Taxation was of two forms, namely, license taxes and stamp taxes. The history of this struggle is important in considering the purposes which apparently prompted the above quoted amendments to the United States Constitution. In that opinion mention is made of the fact that in 1785, four years before Congress proposed the first amendment, the Massachusetts Legislature, following the English example, imposed a stamp tax on all newspapers and magazines. The following year an advertisement tax was imposed. Both taxes met with such violent opposition that the former was re-

pealed in 1786 and the latter in 1788. Duniway on Freedom of the Press in Massachusetts, pp. 136 and 137.

At page 248 of the opinion the Court states in reference to taxation and censorship as applied to the press as follows: "The framers of the First Amendment were familiar with the English struggle, which then had continued for nearly eighty years and was destined to go on for over another sixty-five years, at the end of which time it culminated in a lasting abandonment of the obnoxious taxes. The framers were likewise familiar with the then recent Massachusetts episode; and while that occurrence did much to bring about the adoption of the amendment (see Pennsylvania and the Federal Constitution, 1888, p. 181), the predominant influence must have come from the English experience. It is impossible to concede that by the words 'freedom of the press' the framers of the amendment intended to adopt merely the narrow view then reflected by the law of England that such freedom consisted only in immunity from previous censorship; for this abuse had then permanently disappeared from English practice. It is equally impossible to believe that it was not intended to bring within the reach of these words such modes of restraint as were embodied in the two forms of taxation already described. Such belief must be rejected in the face of the then well-known purpose of the exactions and the general adverse sentiment of the colonies in respect of them."

On page 249 of this same opinion appears the following statements: "In the light of all that has now been said, it is evident that the restricted rules of the English law in respect of the freedom of the press in force when the Constitution was adopted were never accepted by the American colonists, and that by the First Amendment it was meant to preclude the national government, and by the Fourteenth Amendment to preclude the states, from adopting any form of previous restraint upon printed publications, or their circulation, including that which had theretofore been effected by these two well-known and odious methods. * * * Judge Cooley has laid down the test to be applied: 'The evils to be prevented were not the censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent

exercise of their rights as citizens.' 2 Cooley's Constitutional Limitations (8th Ed.) p. 886.''

Also quoting from page 244: ''The tax imposed is designated a 'license tax for the privilege of engaging in such business,' that is to say, the business of selling, or making any charge for, advertising. As applied to appellees, it is a tax of 2 per cent. on the gross receipts derived from advertisements carried in their newspapers when, and only when, the newspapers of each enjoy a circulation of more than 20,000 copies per week. It thus operates as a restraint in a double sense. First, its effect is to curtail the amount of revenue realized from advertising; and, second, its direct tendency is to restrict circulation. This is plain enough when we consider that, if it were increased to a high degree, as it could be if valid (*Magnano Co.* v. *Hamilton*, 292 U. S. 40, 45, 54 Sup. Ct. 599, 78 L. Ed. 1109, and cases cited), it well might result in destroying both advertising and circulation.''

It was held that the act imposing the tax in question was unconstitutional because it abridged the freedom of the press. P. 251.

The case of *Lovell* v. *City of Griffin*, 303 U. S. 444, 82 L. Ed. 949, 58 Sup. Ct. 666, deals with the validity of an ordinance of the City of Griffin, Ga. That ordinance which was held to be unconstitutional because it abridged the freedom of the press, prohibited the distribution of circulars, handbooks, advertising or literature of any kind, whether same were being delivered free or were being sold within the limits of the City of Griffin, without the person making such distribution first obtaining written permission from the city manager so to do. At page 450, in considering the question of freedom of the press, the Court cites with approval the case of *Grosjean* v. *American Press Co., supra.*

■ Freedom of the press secured to the people of the United States by the First and Fourteenth Amendments to the Constitution applies not only to printed matter circulated without charge to the recipients but it also applies when a charge is made for it. *Grosjean* v. *American Press Co., supra; Lovell* v. *City of Griffin, supra.*

■ It is true as the State contends that within limits permitted by law a municipality may enact regulations in the interest of public safety, health, welfare or convenience. Therefore,

we now come to the question as to whether this ordinance as applied to the facts in this case is a valid regulation.

In every case this power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the freedom protected by the United States Constitution. *Cantwell* v. *State of Connecticut,* 310 U. S. 296, 84 L. Ed. 1213, 60 Sup. Ct. 900, 128 A. L. R. 1352; *Schneider* v. *State,* (Town of Irvington, N. J.), 308 U. S. 147, 60 Sup. Ct. 146, 84 L. Ed. 155.

As applied to the facts in this case this ordinance makes no provision regulating the manner of carrying on the business of peddlers within Rutland City. The respondent having paid $10 and so obtained a license would then have been free to peddle these magazines in the City of Rutland at any time, in any place, and in any manner, wholly unrestricted by any provision in the ordinance. In short, her freedom to peddle these magazines there would be as complete as though the ordinance did not exist. To enforce the terms of this ordinance under the circumstances of this case would be to compel the respondent to pay a fee of $10 in order that she might avail herself of a privilege secured to her by the United States Constitution. Also that this requirement of the ordinance, if enforced here, would operate as a restraint upon the circulation of the magazine in question is too plain to need further discussion. *Grosjean* v. *American Press Co., supra.* It follows that as applied to the facts here this ordinance cannot be justified as a valid regulation. *Grosjean* v. *American Press Co., supra; Cantwell* v. *State of Connecticut, supra; Lovell* v. *City of Griffin, supra.*

The only question presented here and therefore the only one considered is the application of this ordinance to the facts in this case. The fact that when so applied the ordinance is unconstitutional does not determine that it would be invalid for that reason when applied to other and different facts. *Whitney* v. *People of the State of California,* 274 U. S. 357, 378, 47 Sup. Ct. 641, 71 L. Ed. 1095; *Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282, 289, 42 Sup. Ct. 106, 66 L. Ed. 239.

We hold that this ordinance as applied to the respondent under the circumstances shown by the evidence in this case is unconstitutional because when so applied it abridges rights of the respondent as to freedom of the press secured to her by the First and Fourteenth Amendments to the United States Constitution.

*Judgment reversed and the respondent is discharged.*