**BUSEY et al. v. DISTRICT OF COLUMBIA.**
**No. 7918.**

United States Court of Appeals for the District of Columbia.

Argued Oct. 6, 1941.

Decided April 15, 1942.

Mrs. Cecil M. Roeder and Mr. Charles Pergler, both of Washington, D. C., for appellants.

Mr. Vernon E. West, with whom Messrs. Richmond B. Keech and Edward W. Thomas, all of Washington, D. C., were on the brief, for appellee.

Before GRONER, Chief Justice, and EDGERTON and RUTLEDGE, Associate Justices.

EDGERTON, Associate Justice.

Appellants were convicted, in the Police Court, of selling magazines on the streets of the District of Columbia without taking out a license or paying a tax. Each was sentenced to a fine of five dollars, or one day in jail. We allowed an appeal.

Appellants stood on the sidewalk, at the corner of Park Road and 14th St. N. W., carrying bags which contained copies of Consolation and of Watch Tower, two magazines published by or for Jehovah's Witnesses. The bags, and also placards which appellants displayed, were lettered to show that the magazines were for sale at five cents each. A policeman bought a copy of Watch Tower from one of appel-lants and a copy of Consolation from the other. Appellants told him they had no license and did not need one. There was no obstruction of the sidewalk and no disorder.

Appellants did not take the stand. No one testified that they considered it their religious duty to sell the magazines, or to refrain from taking out a license and paying a tax. No one testified that they were members of, or affiliated with, Jehovah's Witnesses. The local representative of Jehovah's Witnesses testified that the Witnesses are not engaged in business, but solely in the work of proclaiming the gospel outlined in the Bible; that no one is paid to distribute their magazines; that magazines are given away to those who cannot pay for them; that many more are given away than are sold; and that the only purpose of the signs, "five cents per copy", on the placards and bags, is "to show the people that they can contribute five cents if they want to." This witness also testified that he knew appellants, that they were not "employed" by Jehovah's Witnesses, and that it was not for the purpose of engaging in business that "these magazines are distributed by the defendants for five cents." This testimony, liberally construed, might permit inferences that appellants were affiliated with Jehovah's Witnesses and that they derived no profit from their sales; but it cannot be said to require either inference.

The Police Court found that appellants sold the magazines and were engaged in the business of selling them. That they sold them was proved without contradiction. It is also admitted on this appeal.[1]

The license law of the District provides in § 1736 that "No person shall sell any article of merchandise, or anything whatever, excepting newspapers sold at large and not from a fixed location, upon the public streets, or from public space in the District of Columbia, without a license first having been obtained *under this section.*

---

[1] "The District of Columbia * * * proved that the appellants and each of them * * * did sell ONLY A SINGLE MAGAZINE." Appellants' brief; their emphasis.

The arresting officer testified: "* * * I went up to Richie first and handed him five cents and asked for a magazine. He asked me which one I wanted and I bought this one here, called the Watch Tower. I then walked over to Busey and did the same thing. He asked which one I wanted. I took the Consolation * * *."

The suggestion that if the officer had been unwilling to buy the magazines, and had expressed a desire to receive them as gifts, appellants might have accommodated him, is immaterial. It comes only to this, that if appellants had found no opportunity to make sales in violation of law they would have kept within the law.

* * * " [2] A license tax of twelve dollars a year, or less for fractions of a year, and the wearing of a numbered badge, are required. For the fraction of the year which remained when appellants did the acts complained of, a license would have cost five dollars.[3]

The first section of the license law begins: "No person shall engage in or carry on any business, trade, profession, or calling in the District of Columbia for which a license fee or tax is imposed by the terms of this chapter without having first obtained a license so to do."[4] From this general prohibition, appellants imply a correlative general authorization to carry on, without a license, anything which is not a "business, trade, profession, or calling." They then assume that this implied, and general, authorization of miscellaneous activities should prevail over the directly expressed and specific prohibition of unlicensed street selling, viz.: "No person shall sell any article * * * upon the public streets * * * without a license first having been obtained under this section" (§ 1736). Appellants thus disregard a plain precept of common sense and statutory construction; that express and specific provisions prevail over implied and general provisions which contradict them.

The license law, in its various sections, specifically requires licenses for a great variety of activities. Its first section makes general provisions regarding applications for licenses, the time of obtaining and paying for licenses, and the form, content and transfer of licenses. That section does nothing more. When Congress desired to exempt activities which did not constitute business, or the like, from the requirements of specific sections of the license law, it did so expressly and in those sections themselves. Many sections of the license law are expressly limited, by their own terms, to "business", or "place[s] of business", or activities conducted "for profit or gain" or "for hire."[5] Section 1736 is not so limited. Section 1720(c), which provides for the licensing of buildings in which entertainments are conducted "for profit or gain", contains the further proviso "That for entertainments, concerts, or performances of any kind where the proceeds are intended for church or charitable purposes * * * no license shall be required."[6] Section 1736 contains no such exception. Nor is it, like various state license laws, limited to peddlers, hawkers, or hucksters.

The license law is primarily a police measure rather than a tax on the privilege of doing business. This appears from the nature of the activities to which it applies; from its expressed aim of providing fees "commensurate with the cost * * * of * * * inspection, supervision, or regulation" (§ 1753); and from the fact that other legislation, not here involved, required a license and imposed a gross-receipts tax "for the privilege of engaging in business in the District" (Tit. 20, §§ 970, 970a, 970d). The purpose of § 1736 is to police the streets, by providing means and funds for identifying, supervising and protecting those who sell things there. Let us assume in appellants' favor that they neither derived nor sought a profit from their sales, that their only motive was religious, and that they were engaged in neither a "business" nor a "calling." It does not follow that there could be no occasion to police their sales. There is no clear connection between the profitableness, or the motives, of street sales, and the need of policing them in the interest of public order. Sales for propaganda purposes sometimes need more police protection than sales for business purposes. Nothing indicates that Congress intended to require police and prosecutors to consider questions of profitableness and motive, or that it intended to discriminate against business [7] and in favor of propaganda. The fact that it excepted "newspapers sold at large" shows that it deliberately included other publications. "Newspapers" does not mean newspapers and magazines. It follows that appellants violated the statute.

They contend that it infringes the constitutional guarantees of freedom of the press and of religion. But a law which exacts a reasonable license fee from those

---

[2] D.C.Code (1929), Supp. V, Tit. 20, § 1736; 47 Stat. 557. [Italics supplied.]

[3] Ibid, § 1705.

[4] Ibid, § 1701.

[5] §§ 1702 ("buildings in which moving pictures are displayed for profit or gain"), 1708, 1718 ("persons engaged in the business of manufacturing or renovating mattresses"), 1720, 1721, 1726, 1733, 1734, 1738, 1741, 1751.

[6] Cf. § 1751.

[7] Cf. District of Columbia v. Monumental Tours, Inc., 74 App.D.C. 147, 122 F.2d 195.

who use the streets in special ways does not become invalid when the use has a religious motive. In Cox v. New Hampshire,[8] a license tax on parades in general was upheld in its application to a religious parade. Section 1736 does not, like the law held invalid in Cantwell v. Connecticut,[9] arbitrarily interfere with the soliciting of religious contributions; it does not touch that activity. It does not touch the giving away of publications. A tax which was aimed solely at certain publications, in order to restrict their circulation, was held invalid in Grosjean v. American Press Company, but the Supreme Court said: "It is not intended * * * to suggest that the owners of newspapers are immune from any of the ordinary forms of taxation for support of the government * * *."[10] Neither are they immune from ordinary police regulations. Men who sell magazines are no more immune than men who own newspapers, or bookstores. Section 1736 is not aimed solely, or even specially, at any or all publications, and is not intended or shown to restrict their circulation. "To require a man to pay the taxes that all other men have to pay cannot possibly be made an instrument to attack his independence as a judge";[11] and requiring sellers of religious magazines, along with all other street sellers, to pay a reasonable license fee cannot be made an instrument to attack freedom of the press or of religion.

 Opportunity to convey ideas in public places may not be made to depend upon a public officer's approval of the ideas, or upon his whim;[12] but there is no merit in appellants' contention that § 1736 vests in the Commissioners of the District discretion to grant or withhold licenses arbitrarily, or to make arbitrary regulations with respect to their issue.[13] It authorizes the Commissioners to regulate only the location and conduct of licensed sellers. Unlike various other sections of the license law [14] this section imposes no conditions, precedent or subsequent, to the issue of a license. Appellants allege no discrimination in the enforcement of the law.

It is true that Sections 1753 and 1754 undertake to give the Commissioners discretion to expand or contract the license law, make regulations, and revoke licenses. But we need not determine how far the sales here involved might be brought within those sections, or whether the discretion which those sections seek to give is broader than the Constitution permits. Appellants are not here because of them, or because of any exercise of discretion, or other action, under them. Appellants are convicted of violating Section 1736. If Sections 1753 and 1754 give no discretion, or a valid discretion, to the Commissioners with respect to appellants' sales, they have no effect on these proceedings. Likewise if they attempt to give a discretion which cannot validly be given, they have no effect on these proceedings; for in that case we are expressly required to treat them as severable. Congress has directed that "If any provision of this chapter is declared unconstitutional * * * the validity of the remainder of the chapter * * * shall not be affected thereby."[15]

 We conclude that a reasonable license fee, applicable to street sellers generally, and not intended or shown to restrict the expression of any views, is valid in its application to sellers of religious maga-

[8] 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049, 133 A.L.R. 1396.

[9] 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352.

[10] 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660.

[11] Holmes, J., dissenting, in Evans v. Gore, 253 U.S. 245, 265, 40 S.Ct. 550, 557, 64 L.Ed. 887, 11 A.L.R. 519.

[12] Hague v. C. I. O., 307 U.S. 496, 516, 59 S.Ct. 954, 83 L.Ed. 1423; Schneider v. State (Town of Irvington), 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155. Jones v. City of Opelika, Ala.App., 3 So.2d 74, reversed, 241 Ala. 279, 3 So.2d 76, certiorari granted, 314 U.S. 593, 62 S.Ct. 93, 86 L.Ed. ——, writ dismissed for want of a final judgment, 62 S.Ct. 630, 86 L.Ed. ——.

[13] Cf. Cox v. New Hampshire, 312 U.S. 569, 576, 61 S.Ct. 762, 85 L.Ed. 1049, 133 A.L.R. 1396; Drake v. United States ex rel. Bates, 30 App.D.C. 312, 320.

[14] §§ 1702, 1703, 1709, 1711, 1713, 1714, 1715, 1716, 1721, 1722, 1731, 1731a, 1739, 1740, 1742–1751.

[15] § 1758. Severable provisions.—If any provision of this chapter is declared unconstitutional, or the applicability thereof to any person or circumstance is held invalid, the validity of the remainder of the chapter and the applicability of such provision to other persons and circumstances shall not be affected thereby.

zines.[16] We cannot say that a fee of twelve dollars a year, or five dollars for the period here involved, is unreasonable. We need not consider whether the law applies, or whether it could constitutionally apply, to casual and sporadic sales.[17] Appellants' sales were planned. One does not stand on a street-corner with a stack of magazines, a bag advertising them, and a placard offering them for sale, in order to strike a single casual bargain.

■■■■ Within wide limits, democracy and the Constitution require freedom of expression and freedom of legislation. We are asked to invade the second freedom in order, it is said, to protect the first. It is not for us to say whether the license law is good for the community. It is an Act of Congress. Though it covers some sales of religious literature, it conflicts with no defensible concept of the constitutional freedom of the press or of religion. We must therefore enforce it.

Affirmed.

RUTLEDGE, Associate Justice (dissenting).

I do not think the statute applies to what defendants did. If it does, in my view it is invalid in such an application. The issues lie along the border between the power of government to tax and regulate business activities and freedom of religion and the press. Defendants' acts, in my opinion, fall inside the latter regions, whether within the statute's meaning or constitutional right. They were essentially religious proselyting and distribution of religious literature, not business or commercial transactions. But if they could be regarded rightly as having commercial character the statute does not cover them.

I

*Applicability*

Chapter 10,[1] of which Section 1736 is a part, is a business licensing act. It has no relation to noncommercial activities. It applies to money-making pursuits. Licenses are required for any person to "engage in or carry on any business, trade, profession, or calling," as specified in later sections. Section 1701. This is the "master" section, pursuant to which the others are specifically definitive. It and they are pertinent in construing Section 1736. They impose license fees on pharmacists, auctioneers, barbershops, laundries, amusement places, hotels, private detectives, employment agencies, secondhand dealers, etc. It is engaging in business, money-making enterprise, not religious activities or casual or occasional business transactions, which the statute covers.

In a few instances the language of particular sections, considered out of context with other parts of the chapter, could be construed to specify casual, occasional or particular acts, occurring without the frequency, continuity, repetition or regularity essential to engaging in business or pursuing a calling. Sections 1736, 1737, 1738. Taken most broadly and literally, the first sentence of Section 1736 would prohibit making any sale or contract of sale on the public streets without a license. The language is: "No person shall sell any article of merchandise, or anything whatever, excepting newspapers sold at large and not from a fixed location, upon the public streets * * * without a license * * *."

Possibly Congress intended to prohibit every street sale unless licensed. I do not think so. More consistently and reasonably, "sell any article of merchandise, or anything whatever" can mean to sell in a manner which constitutes doing business, earning a livelihood, or making a profit from something more than single or sporadic transactions. That this was the meaning intended is shown by reading Section 1736 in context with Section 1701 and other sections, by other language within the section itself, and by the history and objects of the legislation.

Chapter 10 is not a string of independent statutes, each section a law unto itself. It is a unified act, having throughout its structure a common general pattern, pur-

16 Massachusetts v. Pascone, 308 Mass. 591, 33 N.E.2d 522, certiorari denied, 314 U.S. 641, 62 S.Ct. 82, 86 L.Ed. ——; Cole v. Fort Smith, 202 Ark. 614, 151 S.W.2d 1000, certiorari granted, Bowden v. Fort Smith, 62 S.Ct. 903, 86 L.Ed. ——, Cf. City of Manchester v. Leiby, 1 Cir., 117 F.2d 661, certiorari denied 313 U.S. 562, 61 S.Ct. 838, 85 L.Ed. 1522; Hannan v. City of Haverhill, 1 Cir., 120 F.2d 87, certiorari denied, 314 U.S. 641, 62 S. Ct. 81, 86 L.Ed. ——. Contra, State of Vermont v. Greaves, 112 Vt. 222, 22 A. 2d 497.

17 § 1758; supra, note 15.

1 D.C.Code (Supp. V, 1939) tit. 20 [D. C.Code (1940) §§ 47—2301-2350].

pose and subject matter, namely, to license, regulate and tax engaging in business. The principal function is regulatory. But not all businesses were to be licensed, and not all licensed were to be regulated and taxed alike. For that reason the statutory structure comprises a controlling general section, of which the latter ones are specifications. The master section (1701) imposes the general prohibition, fixes the general form and nature of the fee or tax, and prescribes for all definitive sections the procedure for obtaining the license, its contents, and the conditions for issuance and transfer. It also defines in general terms the subject matter of the license, tying the definition explicitly to each following section: "No person shall *engage in* or *carry on* any *business, trade, profession,* or *calling* in the District of Columbia *for which* a license fee * * * is imposed *by the terms of this chapter* without having first obtained a license so to do." [Italics supplied.] Thus Section 1701 at once limits, and is limited by, the subsequent definitive sections, including 1736. They particularize it in two respects. These are (1) to define concretely the businesses to be licensed, and (2) to fix the amount of the fee. Nearly all designate a business, trade or calling so clearly and exclusively that they could not apply literally or otherwise to isolated business transactions or noncommercial activities.

Section 1736 must be limited likewise, unless it is torn from the chapter's context and set up as an independent act radically departing from the general pattern. It should not be so ripped out of its setting. Read in conjunction with Section 1701, "sell any article of merchandise, or anything whatever" identifies and particularizes the "business, trade, profession, or calling * * * *for which*" the "license fee * * * is imposed *by the terms of this chapter*," namely, in this case, Section 1736. In this reading the section becomes, as are the others, an instance of licensing *a business,* not an incongruously disconnected act for licensing and imposing a sales tax on casual street bargains or for licensing, regulating, and taxing unpopular religious and political activities, whether with or·without a monetary incident. It thus assumes a generic consistency with the chapter in subject matter, purpose and function. A broader view makes it a stranger and an alien in its statutory household.

Furthermore, such a view can be given only by severing "sell any article of merchandise, or anything whatever," not only from the chapter, but also from the remainder of the section. Defendants say it is a hucksters and peddlers act. Their view is borne out when the section is taken together as a whole[2] and the quoted words are illuminated by what follows. This ·combines with the legislative history to bring the section, in kind with others, within the general boundary of subject matter imposed by Section 1701 upon the chapter as a whole.

Section 1736 consolidated two former sections.[3] These applied in terms exclusively to hucksters and peddlers. From

---

[2] The entire section (1736) is as follows: "No person shall sell any article of merchandise, or anything whatever, excepting newspapers sold at large and not from a fixed location, upon the public streets, or from public space in the District of Columbia, without a license first having been obtained under this section. Persons so licensed shall be considered as venders, *whether selling from a fixed location, on foot from house to house, or from a vehicle* of any description, and shall pay a license tax of $12 per annum. Every vender so licensed shall be *furnished with a badge* corresponding to the number of his license, which badge shall be *worn conspicuously whenever transacting business,* and *where sales are made from a vehicle* such vender shall be provided with a . *metal plate* containing a number similar to the number of his license, which plate shall be *conspicuously attached to the vehicle* at all times when such vender is *transacting ·business:* Provided, That no license shall be required of any person bringing to and *selling at the several markets* produce of his own raising: And provided further, That *raisers of produce* shall not be exempt from the license tax imposed unless they *sell* such produce *at the several markets* or *by the wholesale in cart, wagon, or carload lots.* The Commissioners of the District of Columbia are hereby authorized and empowered to make, modify, and enforce necessary regulations governing the conduct upon the public streets and public spaces of *venders licensed hereunder, including the power to locate the places where licensed venders* on the public streets and public spaces *shall stand, and to change them as often as the public interests require.*" [Italics supplied.]

[3] D.C.Code (1929) tit. 20, §§ 900, 903, 32 Stat. (1902) 626, 627, Pars. 33, 35.

them Section 1736 imports all its provisions, except the general definition of the businesses to be licensed and taxed. For the former specific terms "huckster" and "peddler," typed hangovers from horse-and-buggy days, it substitutes the generic statement of the class to which they belong. There was reason to include other small retailers of their type. There was none for going beyond the class in consolidating the two sections in a general business licensing act.

Entirely apart from the importation, the section's subsequent provisions show what Congress intended by "sell any article of merchandise, or anything whatever." The illustrations, "selling from a fixed location, on foot from house to house, or from a vehicle," describe the peddler, the huckster, the popcorn vendor, the newsstand proprietor, the solicitor or house-to-house salesman. So do the exceptions in favor of produce raisers selling "at the several markets" and "by the wholesale in cart, wagon, or carload lots"; the provisions for wearing a badge *"whenever transacting business"* and attaching a metal plate to the vehicle "when such *vender* is *transacting business"*; and the power given the Commissioners to make and enforce regulations "governing the conduct upon the public streets * * * of *venders* licensed hereunder." All these provisions show that the subject of the regulation is the itinerant or sidewalk retailer, who is engaged in small scale merchandising, not the casual bargainer or the proselyter. The exception of newsboys does not contradict, rather it confirms this view. They sell papers to make money, not to advocate what the papers contain. Their business is a daily round, regular and continuous. Congress made sure the most favored small ·merchant's exemption because the section and the chapter cover that sort of thing, not because they include isolated ˙sales or proselyting. [Italics in this paragraph supplied.]

Counsel recognize this in the brief and in argument. They candidly admit, "A small charge for use of the public streets *for business purposes* is also, probably, included in the fee." [Italics supplied.] Such a charge is proper and customary for special business use of public highways. It is neither usual nor appropriate for occasional transactions or pamphleteering.[4] It is also argued from Lewinsohn v. United States,

7 Cir., 1921, 278 F. 421, 425, that proof of a single sale permits inference that "it was *one* of the *ordinary and usual incidents* of the *business* there conducted." [Italics supplied.] The argument substantially admits that the section covers only engaging in business, not solitary transactions or nonbusiness activities. But it attempts to avoid the effect of the admission by asserting that a single sale may be taken as evidence to establish that a business is being conducted. The case does not sustain the assertion. It involved abatement of a nuisance under the Volstead Act, and the court was careful to say that proof of a single sale must be supported by surrounding facts to warrant the quoted inference. The statement, so qualified, hardly shows that Congress intended Section 1736 to cover casual transactions or to convert the missionary activities of Jehovah's Witnesses into a business enterprise. It shows only that a single sale may be evidence of conducting business, when other facts give it that significance. There are no such facts in this case.

It is only by straining the section to unintended ends that casual sales or the kind of missionary effort engaged in here can be brought within its terms. The primary object is regulation (including identification) of vendors, with the raising of revenue to defray its cost as an incidental feature.[5] Section 1753. Casual sellers, street preachers, soapbox orators, and pamphleteers are not productive sources of revenue. Congress did not intend to tax them by this act. Nor would the statute effectively identify them. Merchants, sidewalk or itinerant, pedestrian or vehicular, may be expected to procure licenses. They are usual subjects of license regulation and taxation. Casual bargainers and proselyters are not. For them—and they are most of us—the act would be merely a trap, not a regulation, or a protection of the public. They would sell first—and then go to jail. If the propagandist needs identification or other regulation, it is not as a huckster, peddler or ice-cream vendor. The fee is an annual charge. Applied to the casual street bargainer, it becomes in effect a sales tax, and to the home missionary or political pamphleteer a missapplied excise.

I do not think therefore that Congress intended to tax every street sale or to lump together for regulation and taxation all the miscellaneous activities, mercantile,

---

[4] Cf. text circa note 17 infra.

[5] Cf. text circa notes 10, 14–16 infra.

religious, political, which the majority's broad application of the section makes possible. Congress was not after the Salvation Army and the "lassies" who hand out "War Cry" from office to office, collecting dimes as they come and go. It was on the trail of the Fuller-brush man, the butter-and-egg man, the ice-cream wagon, and the magazine salesman.

Not every activity which involves a monetary incident is merchandizing. Neither religion nor politics can be run without money. Nor can missionary effort, religious or political. Dissemination of ideas is expensive, if appreciable hearing is secured. That a system or plan, whether "organized" or casual, includes some element of business does not make it a "business, trade, profession, or calling" within the meaning of this statute. Publication and distribution of religious literature may be done in a manner which amounts to doing business. But to confuse such activity with the kind carried on here disregards major emphases which distinguish the church from Woolworth's, the political party from "Wall Street." It is not necessary, therefore, to draw precisely the lines between huckstering, peddling, retail vending and casual selling or propaganda, with or without a price.[6] If the difference is "merely one of degree," so are other crucial ones in life and in law. They are commonly perceived or may be made apparent by evidence not hard to obtain or beyond the power of judges to comprehend and apply. "Sell any article of merchandise, or anything whatever" means therefore to sell as licensed vendors usually sell, for gain, in some course of business, making the article or thing an object of trade, a commodity of the mart of the street. It means to "engage in or carry on" some "business, trade, profession, or calling" within the terms and intent of Section 1701.

Whatever else defendants were doing, they did not "engage in or carry on" a business. What they did was the very antithesis of business. There was no gainful activity or activity directed toward gain. That is true, whether their acts were merely casual or were incidents of "a plan." Only one "sale" by each defendant was proved. There is no evidence that they or anyone else made similar "sales" in the District of Columbia before or after the one occasion. Evidence of the so-called plan

described the general method Jehovah's Witnesses use to distribute their literature, which defendants followed in this case. That others followed it elsewhere was not material to whether what they did here violated the statute. Without more, the two "sales" proved could not support an inference that they carried on a business, Lewinsohn v. United States, supra, or were other than casual distributors.

But there are stronger and broader reasons. There was no business here, first, because there was no sale, technically or substantially; second, because what defendants were doing was in no ordinary, proper or qualitative sense business or commercial activity. The latter is true, whether or not their acts were sales in the technical sense, and whether or not they were part of "a plan." The question is not whether there was a plan. It is rather what kind of a plan defendants were following. If the section, as I think, is a business licensing act, any plan within its terms must be one for engaging in or carrying on the business of retail street selling. Neither the chapter nor the section is directed against all organized plans. The facts show conclusively, in my opinion, that defendants neither made sales nor engaged in the business of selling.

"Consolation" and "Watch Tower" are religious publications, whether styled magazines, periodicals, pamphlets or newspapers. They contain no advertising. It is not shown they have subscription lists. Their purpose is to promote the tenets of Jehovah's Witnesses. By whom they are published does not appear specifically. But it is fairly inferable the publisher is the Watch Tower Bible and Tract Society, apparently an agency for Jehovah's Witnesses. Nothing in the record shows that the publisher conducts a commercial enterprise or does not operate at a loss made up by religious contributions.

Distribution is by volunteers. They are paid nothing for their work. The defendants were not employed by Jehovah's Witnesses or the Society. They gave their time to the cause as volunteers. It is not shown that the Society knew of or authorized their acts, supplied them with the copies, or had with them any relation of principal and agent. For all that appears they may have obtained the copies entirely independently of any connection with the publisher.

---

[6] Cf. text circa notes 7, 18, 19 infra and authorities cited.

If there was "a plan," it was very loose and casual, neither a business nor a businesslike activity. The "plan" was that persons who accepted copies could "pay" or give a nickel to the distributor if they wished, but were not required to do so. Anyone who wanted a copy could have it for the asking. This is shown both by evidence concerning the "plan" in general and by what occurred here in particular. Undisputed testimony is that more copies are given away than are "sold" and payment is never a condition of receiving a copy. The prosecuting officer's testimony concerning what took place confirms this: "I observed them *for a period of time* and I saw each of them *give* one of these magazines to some citizen * * *. Then I went up to Richie first and *handed him* five cents and *asked for* a magazine." [Italics supplied.] He did likewise with Busey. Then he asked if they had licenses. When they said "no," he arrested them.

It is true the defendants carried signs: "Watch Tower explains the Theocratic Government, five cents per copy," "Consolation, a Journal of Facts no other magazine Dares to Print, five cents per copy." But neither the officer nor anyone else was misled by the signs, according to his own and the only testimony in the record. He knew he could have his copies without paying, if he wished. He knew this because he had observed the defendants giving copies away, but he had not seen them "selling" copies to others. If he had seen other "sales," he could have saved his own nickels. He did not testify, nor did anyone, that there were "sales" before he handed the coins to defendants or, for that matter, before or after this occasion. He gave them the nickels, not because he wanted to make a "purchase" or a donation, or because he thought he had to do so to secure the copies, but because he wanted to make an arrest. He *"handed him* five cents and *asked for* a magazine."

This may not have been technical entrapment. It was that in substance. Without the officer's initiative, it is wholly speculative whether any "sale" would have taken place. What is perhaps more important, the officer's knowledge concerning the actual conditions of the "offer" deprived his

exchange of coin for paper of any semblance of character as a "sale." If this were a sale, it would add a new species to that genus, namely, one for a price which can be paid or not as the buyer wishes without condition. If these transactions were "business," they were not business for profit or livelihood either to defendants or to the publisher. The commodity was not commercial, the methods were not commercial, and the purpose was not commerce. No business could survive under such a plan. Nor would casual bargains be made on such a basis. In short, the activity was neither "sales" nor "business." It was essentially the distribution of religious literature on the receiver's terms,[7] a form of religious proselyting and pamphleteering.

In my opinion it was not deprived of that essential character by the element of solicitation for money. Nothing in Section 1736 prohibits the free distribution of literature. Nor does it forbid mere solicitation of funds for religious causes. I do not think it prohibits both, when they are done together. In my view the section would not be applicable, if payment of the nickel had been a condition of receiving the papers. The activity still would be essentially religious pamphleteering and proselyting, not the sale of literature for gain.[8] The section, as I regard it, does not prohibit selling literature without a license except when this amounts to a business enterprise, such as a magazine stand or house-to-house magazine selling for gain. But when, as here, there is no element of gainful enterprise and the "commodity" is tendered to the "buyer" without price, all semblance of sale or business vanishes. When he offers the coin under such conditions, he donates it to the cause just as the people do who drop dimes in Salvation Army tambourines or drums. That is true regardless of whether they take the tendered copy of "War Cry." To regard the parties to such a transaction as bargaining at arm's length, cautiously applying caveat emptor in the manner of housewives dealing with hucksters, strains credulity and common experience. So applied, a statute designed for regulation of business and trade is perverted into one for suppression of unpopular religious and political causes. If these need

[7] Cf. State v. Mead, 1941, 230 Iowa 1217, 300 N.W. 523; State v. Stark, 1940, 196 La. 307, 199 So. 129; State v. Woodruff, 1941, 147 Fla. 299, 2 So.2d 577; State v. Meredith, 1941, 197 S.C. 351, 15 S.E.2d 678; Village of South Holland v. Stein, 1940, 373 Ill. 472, 26 N.E.2d 868, 127 A.L.R. 957.

[8] Ibid. Cf. the authorities cited notes 18, 19 infra.

regulation, it should be made by Congress in statutes intended and adapted to that end.

Finally, if necessary to avoid so questionable an application, what defendants did might be regarded reasonably as falling within the exception of "newspapers sold at large and not from a fixed location." The "sales" here were at large, not from a fixed location. "Watch Tower" and "Consolation," for all that appears, might be considered newspapers, though they are called magazines in the record. There are weekly and monthly religious newspapers. We do not have the benefit of exhibits, but it may be inferred from the slight description the record affords that "Watch Tower" and "Consolation" contained facts, arguments, comment. So do newspapers. There is a commonly accepted distinction between newspapers and magazines, but the borderline is hazy.[9] Some newspapers are very much like magazines. Witness "P. M." Some magazines are very much on the order of newspapers. Witness "Time." Probably "Watch Tower" and "Consolation" do not fit neatly in either category. But in the interest of free expression the statutory exception should be liberally construed. If this is done, publications doubtfully classifiable, as are these, should fall within the newspaper class for purposes of applying Section 1736.

## II

### Severability

Enough has been said to show that severability is the crucial issue. On it depend the present application of Section 1736 and, as appears below, its validity. That section, construed and applied consistently with Section 1701, affects street vending only as a business. "Sell any article of merchandise, or anything whatever" means to "engage in or carry on * * * business." It means also to do this subject to the special controls provided by Section 1754. This confers on the Commissioners power "to make any regulations * * * in furtherance of the purpose of this chapter, and to revoke any license issued hereunder * * * for any other reason they may deem sufficient."[10]

The power is both legislative and enforcing. It enables the Commissioners to make and apply regulations especially adapted to the varied businesses required to be licensed. It makes Chapter 10 primarily a regulatory act, not merely one for raising revenue. For this reason the fees are not uniform, as they appropriately would be if it were the latter. They are made to vary widely in amount so as to be "commensurate with the cost * * * of such inspection, supervision, or regulation" (Section 1753) as this is estimated to differ from business to business. Without the special power of regulation, the statute would be chiefly a revenue act with no substantial reason for the unequal rates of taxation. The Commissioners' broad power to revoke licenses and, it would seem, to use discretion in selecting licensees would vanish. Their special and highly discretionary authority, both to make and to enforce regulations under Section 1754, would give way to mere general police supervision applicable to the community at large without necessity for special license or legislation. In short, it is Section 1754, coupled with Section 1701, which makes Section 1736 and all other licensing sections a typical business licensing and regulating statute.

On the other hand, severed from them, Section 1736 becomes an entirely different kind of statute. Its scope is expanded to include all sorts of street sales not arising in the course of a business. It loses its special regulatory function. The majority concede that the broad controls of Section 1754 cannot stand in application to circulation of news or ideas. For that reason they are forced to sever it also from Section 1736. They say the section is regulatory and must be applied to the present facts because Congress intended to police what the defendants did. But the severance of Section 1754 strikes down the very controls Congress provided for this purpose.

The full effect of the double severance therefore is to strip Section 1736 first of the limitations expressly imposed by Section 1701 on the scope of its operation and then of its regulatory function embodied in Section 1754. The second severance is the offspring of the first. Without disjoinder of 1701, that of 1754 would not be compelled. Together they change Section 1736 from a typical discretionary business licensing act into one for nondiscretionary li-

---

9 Cf. Miller, What Is a Newspaper?, an address delivered at the Eighth Annual North Carolina Newspaper Institute, Durham, North Carolina.

10 The section is quoted in full and discussed below, Part III of this opinion.

cense and taxation of both business and other activities. Such a change obviously is not a minor one. It alters the statute's primary function and essential character.

Further, the change is without the support of any of the usual reasons for severance. Taken together, the three sections form a consistent whole for license regulation and taxation of business. Within this broad field they have full scope for valid operation. So applied they are not irreconcilable or inconsistent, invalid or ineffective. The severance is not required, therefore, to save any section or provision from being inoperative, inconsistent or invalid, whether on its face or in any necessary application. It is made solely to expand the scope of the section's operation so as to bring within it acts, like those in question, which would not be within its purview under conjunctive application with the other sections.

Severance so emasculating, or for such a purpose, is not authorized either by general principles of construction or by Section 1758, the chapter's severability clause, on which the majority rely. Usually severance is the last resort of baffled judges to escape fatal inconsistency, inoperativeness or invalidity not otherwise avoidable. Often it is denied, though one of these evils may follow, because it would so change the statute's intended effect as to be judicial legislation.[11] It is never to be made readily, or so as to create conflict or invalidity. It would seem unjustified when the only effect is to give broader application to a provision, otherwise operative and valid, than can be made in conjunction with others united to it in terms and in function.

Presence of a severability clause does not change these principles or their applicability. It merely expresses the legislative permission to sever if they are not violated. Section 1758 is not carte blanche to sever at will. It allows severance only "if any provision of this chapter is declared unconstitutional, or the applicability thereof to any person or circumstance is held invalid."

This does not authorize severance merely to make an additional application which becomes possible because a provision's terms, when severed and literally applied, may com-

prehend it. The purpose is rather to save a provision or a necessary application from invalidation. That is the sole ground the section provides for severance. It would support the severance of Section 1754, if that were not in turn founded upon and required by the severance of Section 1701. For it, however, there can be no pretense of foundation in invalidity. As has been shown, Sections 1701 and 1736, applied together, are both valid and consistent. There is no necessary conflict. The broad terms of Section 1736 may be reconciled fully with the narrower limits of Section 1701. So harmonized, however, they do not cover the present facts.

The double severance, therefore, finds no basis either in Section 1758 or in general principles of severability. It disregards the express terms of Sections 1701 and 1754, brings the former into conflict with Section 1736 and invalidates Section 1754 for the resulting application. It abrogates the controls Congress has expressly applied to all licensees, including all street vendors covered by the act. It changes the section's fundamental character and function. It does all this, not to save the section or any essential application, but to give it wider operation than it otherwise could have or, in my judgment, Congress intended it should have.

Such a severance emasculates the statute. It amounts to judicial legislation. The section as applied in function and effect is not the section Congress enacted. If such changes are needed, Congress should make them in legislation designed for the purpose. It is hardly necessary to add that whether the Commissioners have or have not exercised their power under Section 1754 in relation to these defendants is immaterial. The existence and nature of the power, not the failure to exercise it, are the important matters for construction, severance and validity.

### III

### *Validity*

My views concerning the construction and application of the statute would make it unnecessary to discuss constitutionality but for the fact the majority have held it ap-

---

11 Cf. Weco Products Co. v. Reed Drug Co., 1937, 225 Wis. 474, 274 N.W. 426, 433, (1938) Wis.L.Rev. 534; Springfield Gas & Electric Co. v. Springfield, 1920, 292 Ill. 236, 126 N.E. 739, 743, 18 A.L.R. 929; Woolf v. Fuller, 1934, 87 N.H. 64, 174 A. 193, 94 A.L.R. 1067.

The last case denied severance in circumstances where the effects would have been similar to those produced in this case by extending operation of a statute regulating itinerant vendors to include others not within that class.

plicable. In my opinion it is invalid in this application.

Legislative power over the streets extends to all reasonable regulation in the interest of convenient use by the public. Regulation of traffic, prevention of nuisance, securing good order and decorous conduct are among its proper objects. Business activities particularly fall within its scope. If travel is the primary use,[12] others may be made consistent with it.

But the power is not absolute. Some things the legislature cannot forbid. These are not limited to orderly movement. Others have become part of the heritage of freedom of the streets. Thus, they "are natural and proper places for purposes of assembly, of interchange of thought and opinion on religious, political and other matters, either by word of mouth or by the distribution of literature. Such use * * * sanctioned by ancient usage, has become part of the liberties of the people protected by the Fourteenth Amendment from state encroachment"[13] and, I think, by the First and Fifth from federal impairment. Congress could not, apart from martial law, order silence on the streets. Cf. Cantwell v. Connecticut, 1940, 310 U.S. 296, 308, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352. It cannot absolutely prohibit the distribution of literature. Schneider v. State, 1939, 308 U.S. 147, 60 S. Ct. 146, 84 L.Ed. 155; Chrestensen v. Valentine, 2 Cir., 1941, 122 F.2d 511, certiorari granted 1941, 314 U.S. 604, 62 S.Ct. 301, 86 L.Ed. ——; City of Chicago v. Schultz, 1930, 341 Ill. 208, 173 N.E. 276. Parades and assemblies may be regulated, but not forbidden completely. Cf. Hague v. C. I. O., 1939, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423. The same appears to be true concerning orderly solicitation of funds for bona fide religious purposes. Cf. Cantwell v. Connecticut, supra.[14]

This case is complicated by no element of fraud, misbehavior or inconvenience to the public. Defendants' sincerity and the genuine quality of their religious activity are not questioned. There is no suggestion they used it as a cover for fraud or personal gain. That they conducted themselves with decorum and did not inconvenience the public appears affirmatively from the evidence.[15] There was nothing to show that the contents of the papers were obscene or otherwise objectionable.

If the statute is applied presently as it is written and intended, it is clearly invalid, first, by reason of the controls imposed on licensees by Section 1754. The power it gives the Commissioners would be unrestrained censorship in these facts. In full the section is as follows:

"The Commissioners are further authorized and empowered to make *any regulations* that may be necessary in furtherance of the purpose of this chapter *and to revoke any license* issued hereunder when, *in their judgment,* such is *deemed desirable* in the interest of public decency or the protection of lives, limbs, health, comfort, and quiet of the citizens of the District of Columbia, *or for any other reason they may deem sufficient.*" [Italics supplied.]

The section applies in terms to "any license issued hereunder" and therefore includes those issued under Section 1736. Greater discretion hardly could be conferred. Unlimited authority to regulate is coupled with unbridled power of revocation. Whether or not such a power could be sustained when applied to the business activities Congress had in mind, a license to distribute literature for purposes of propaganda, revocable in the judgment of administrative officials "for any other reason they may deem sufficient," involves the worst form of intellectual and religious suppres-

---

[12] Cox v. New Hampshire, 1941, 312 U.S. 569, 574, 61 S.Ct. 762, 85 L.Ed. 1049, 133 A.L.R. 1396; Schneider v. State, 1939, 308 U.S. 147, 160, 60 S.Ct. 146, 84 L.Ed. 155.

[13] Hannan v. Haverhill, 1 Cir., 1941, 120 F.2d 87, 88, certiorari denied, 1941, 314 U.S. 641, 62 S.Ct. 81, 86 L.Ed. ——.

[14] The ordinance required that a license or permit be procured from an administrative official who was empowered to determine the religious character of the project. This the court held a censorship of religion, though it left the door open for some other method of guarding against fraud. However, the implication

of the opinion seems to be that solicitation of funds for bona fide religious purposes is part of freedom of religion and cannot be prohibited absolutely, though its practice on the streets may be regulated.

[15] Two police officers testified they were not disorderly, and the prosecuting witness that they did not disturb the peace "before, during or after arrest," were "quiet * * * not bothering anybody * * * were courteous and did not say anything out of the way at all." They did not "occupy too much space on the sidewalks," did not have a stand, nothing was spread out on the sidewalk.

sion. Cantwell v. Connecticut, supra. No free press could survive in subjection to such authority. Such an act applicable in terms to newspaper circulation, on or off the streets, would have no semblance of validity. That would be true whether or not newspapers were singled out for this form of license and without regard to whether a power so vast would be valid as applied to other types of business.

The circulation of ideas has a protection beyond that accorded to the circulation of commodities and it tolerates no such censorial supervision.[16] That is so whether the circulation takes place on or off the street and whether or not it occurs in the course of a business. For this reason it can make no difference whether the exchange of paper for coin in this case was or was not a "sale" or "business." Congress therefore did well to exempt newsboys, if it intended otherwise to reach the circulation of literature on the streets. But, on that assumption, it did not do well enough. If newspaper circulation could not be subjected to this form of control, neither can that of "Watch Tower" and "Consolation." As applied to dissemination of ideas, the Commissioners' power under Section 1754 is power of unrestrained censorship and vitiates any application of Section 1736 to distribution of printed or written material.

To escape this the majority sever Section 1754. The reasons prohibiting the severance have been stated. But if it is made, the escape is illusory. In my opinion the statute cannot be validly applied if the section is eliminated, first, because the act provides discretionary controls incompatible with free speech, a free press and freedom of religion apart from those of Section 1754.

It is implicit in the statute that the Commissioners have some power of selection, as well as regulation, of the licensees. It nowhere requires that the license be issued merely on paying the fee and supplying the information called for. Section 1701 merely provides: "No license shall be granted until payment for the same shall have been made," which is not equivalent to requiring that it be issued when payment is made. The nega-

tive prohibition cannot be inverted into affirmative requirement which disregards the other conditions of the statute. These include making application for license and specifying the licensee's name, the "business, trade, profession, or calling for which it [license] is granted," and the location at which it is to be carried on. Subsequent sections apply these conditions to auctioneers, fortune tellers, slot machine operators, pool halls, massage establishments, and other like enterprises, as well as street vending. Taking together the nature of the businesses and the nature of the information required for a license, it is impossible to believe that Congress intended the Commissioners to license Tom, Dick or Harry to carry on such enterprises merely on identifying themselves and paying the tax. Some power of selection, therefore, as well as regulation of persons selected for license, seems to be implicit in the statute. And Section 1753 confirms this by showing that the chapter contemplates broad power in the Commissioners in respect to "inspection, supervision, or regulation" of the businesses or callings it covers. Elimination of Section 1754, therefore, does not relieve the statute of the obnoxious discretionary power which vitiates the present application.

If, however, the severance is expanded to include all such authority, whether of selection, regulation or revocation, that is, all regulatory power except the general police supervision existing independently of the statute, Section 1736 becomes an act which performs only two functions, license taxation and previous identification of licensees. So denuded of regulatory power, the Commissioners would have no discretion but to issue the license when the fee is tendered and the identifying information supplied. In my opinion, this would make the section's present application only less clearly invalid.

Previous identification by nondiscretionary license has been sustained on similar facts, City of Manchester v. Leiby, 1 Cir., 1941, 117 F.2d 661, certiorari denied, 1941, 313 U.S. 562, 61 S.Ct. 838, 85 L.Ed. 1522, though that requirement dangerously approaches "previous restraint."[17] Section

---

[16] "In every case, therefore, where legislative abridgement of the rights is asserted, the courts should be astute to examine the effect of the challenged legislation. Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions." Schneider v. State, 1939, 308 U.S. 147, 161, 60 S.Ct. 146, 151, 84 L.Ed. 155.

[17] Even a "ministerial" or "nondiscretionary" power to license is subject to abuse, remediable ordinarily by manda-

1736, however, goes beyond the Manchester ordinance[18] and adds taxation to previous identification. The charge "for use of the public streets for business purposes" is proper for business use beyond the common right. It is a sort of rental or reimbursement for wear and tear from special use. But it has no valid bearing on the common right or use, more especially those of free speech, a free press, and freedom of religion or conscience.

That these are part of street heritage means they cannot be impaired by any power capable to destroy them, notwithstanding their exercise may be regulated appropriately in accommodation to other uses. Taxation is not appropriate for such regulation. Once that wedge enters, it widens with every legislative stroke. Its chief effect toward securing public order, decorum and free movement of traffic is by suppressing public expression. Taxed speech is not free speech. It is silence for persons unable to pay the tax. Nor is taxed *distribution* of literature a free press, Grosjean v. American Press Co., 1936, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660, or taxed dissemination of religious views, whether oral or in print, freedom of religion. The Stamp Tax was coparent, with "previous license," of the First Amendment. Not merely the stamp, but the tax as well, spawned the abuses on which the Amendment closed the doors of our system. As presently applied, Section 1736 opens the way to their reëntry. The stamp was a form of license. The tax was its price. That in substance is what Section 1736 amounts to in this case. The charge falls directly on the act of distribution. It will bear most heavily on persons least able to afford it and most in need of avenues for free communication, just such as Jehovah's Witnesses, who do not have the money to buy radio time and newspaper space. Combining taxation with previous identification closes the streets of the District to large numbers of people for use in orderly presentation of their views and thereby closes their only avenue to public attention. Little good will be done by preserving the right against the more obnoxious forms of previous restraint, Lovell v. Griffin, 1938, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949; Schneider v. State, supra; Hague v. C. I. O., supra, only to have it suppressed by less offensive ones or by resurrection of the Stamp Tax in the guise of a "business license." Cf. Grosjean v. American Press Co., supra, 297 U.S. at pages 245–250, 56 S.Ct. 444, 80 L.Ed. 660.

Neither the right nor the consequences are affected by defendants' acceptance or willingness to accept the five cents per copy. In my view, under the circumstances this came to no more than solicitation of funds for religious purposes. No doubt that could be regulated by appropriate legislation, including proper provision for previous identification, cf. Cantwell v. Connecticut, supra, 310 U.S. at page 306, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352, though whether it might also be taxed is doubtful. But this need not be determined. Whether defendants were soliciting donations or technically making "sales" in my opinion is not material. In either event this phase of their activity was merely an incident of the right to spread religious ideas and information.[19] If they had the right to do this free from such restrictions as the statute imposed and without receiving funds, it was not taken away by accepting these small donations or payments, however they are regarded.[20] Without attempting to classify phases of the "plan" as "business," "sales," "donations," "payments," "solicitation," or "casual transactions," the line between free distribution of literature on the street, which cannot be prohibited, and what was done here is too

---

mus or other like proceeding. Perhaps the danger of abuse would be greatest and effectiveness of the remedy least in relation to the expression of unpopular religious or political beliefs by minority groups lacking in social prestige. For some of them the costs of litigation to redress abuse would be prohibitive. Not all are so tenacious in the courts as are Jehovah's Witnesses. For them or for others the very necessity of suing for redress would have, practically, the effect of "previous license." There should be some places, other than in the privacy of his own home, where the least influential citizen is free to express his views, without license of any kind or payment of tribute to Caesar.

[18] The charge was nominal and was returnable on surrender of the badge issued when it was paid. 117 F.2d at page 665.

[19] Cf. State v. Meredith, 1941, 197 S.C. 351, 15 S.E.2d 678; State v. Stark, 1940, 196 La. 307, 199 So. 129; State v. Mead, 1941, 230 Iowa 1217, 300 N.W. 523.

[20] Cf. State v. Woodruff, 1941, 147 Fla. 299, 2 So.2d 577; Village of South Holland v. Stein, 1940, 373 Ill. 472, 26 N.E.2d 868; State v. Greaves, 1941, 112 Vt. 222, 22 A.2d 497; Reid v. Brookville, D.C.W.D.Pa.1941, 39 F.Supp. 30.

thin to sustain a distinction in constitutional right. I think that would be true if payment had been required. It is more obviously so in view of the officer's contrary knowledge and the feature of entrapment. With or without the monetary feature, defendants were pamphleteering, not selling or begging. State v. Mead, 1941, 230 Iowa 1217, 300 N.W. 523. If an absolute prohibition "of expression 'in the marketplace'" cannot be saved by any commercial taint, Chrestensen v. Valentine, 2 Cir., 1941, 122 F. 2d 511, 515, certiorari granted, 1941, 314 U. S. 604, 62 S.Ct. 301, 86 L.Ed. ——, a tax upon it cannot be saved, in my judgment, by any "taint" of solicitation or "selling" which does no more than was done in this case. When to the tax is added the Commissioners' unlimited power of license, there can be no question, as I see the matter, that the present application of the statute is unconstitutional.[21]

Against this it is said that business privilege taxes and like impositions upon publishers in common with others cannot be collected. If that is true, Jehovah's Witnesses, the Salvation Army and other such sects and persons should have been made to pay the business privilege tax, though it is hardly to be assumed the taxing authorities, always eager for new sources of revenue, have extended their reach so far. Such an extension, and other like ones, of the compass of business regulating and taxing measures would be no more incongruous than the present one. But for it, I should have no fear the courts could not mark the necessary boundaries between business and the circulation of literature for religious and intellectual ends, in applying legislation designed for the former.

Finally, if invalidity were more doubtful than it is, "borderline cases are to be resolved not in favor of the regulation, but in favor of the cherished [constitutional] right." Chrestensen v. Valentine, supra, 122 F.2d at page 515. This is no time to wear away further the freedoms of conscience and mind by nicely technical or doubtful construction. Everywhere they are fighting for life. War now has added its censorships. They, with other liberties, give ground in the struggle. They can be lost in time also by steady legal erosion wearing down broad principle into thin right. Jehovah's Witnesses have had to choose between their consciences and public education for their children. In my judgment, they should not have to give up also the right to disseminate their religious views in an orderly manner on the public streets, exercise it at the whim of public officials, or be taxed for doing so without their license. I think the judgment should be reversed.

---

21 Ibid. Commonwealth v. Pascone, 1941, 308 Mass. 591, 33 N.E.2d 522, certiorari denied, 1942, 314 U.S. 641, 62 S.Ct. 82, 86 L.Ed. ——, raised on appeal only the questions of the complaint's legal sufficiency and the statute's constitutionality, the defendant having confined his exceptions to the denial of his motion to dismiss the charge, and made none on the issue whether the proof supported it. The license fee was imposed for use of fixed locations for business purposes.

Cole v. Fort Smith, 1941, 202 Ark. 614, 151 S.W.2d 1000, certiorari denied, Bowden v. Fort Smith, 1942, 314 U.S. 651, 62 S.Ct. 99, 86 L.Ed. ——, certiorari granted, 1942, 62 S.Ct. 903, 86 L.Ed. ——, involved house-to-house canvassing, and the state court's opinion makes no reference to any discretionary provision such as Section 1754 in the District of Columbia statute.