## JONES *v.* OPELIKA.

NO. 280.

## BOWDEN ET AL. *v.* FORT SMITH.

NO. 314.

## JOBIN *v.* ARIZONA.

NO. 966.

Argued (No. 280) February 5, 1942 and (Nos. 314 and 966) April 30, 1942.—Decided June 8, 1942.

---

*Mr. Hayden C. Covington,* with whom *Mr. Joseph F. Rutherford* was on the brief (*Mr. Alfred A. Albert* entered an appearance), for petitioner in No. 280. *Messrs. Osmond K. Fraenkel* and *Hayden C. Covington* for petitioners in No. 314. *Mr. Hayden C. Covington* for appellant in No. 966.

*Mr. John W. Guider,* with whom *Mr. William S. Duke* was on the brief, for respondent in No. 280. No appearance for respondent in No. 314 and appellee in No. 966.

*Mr. Osmond K. Fraenkel* filed a brief in No. 280 (with *Mr. James A. Simpson*), and in No. 966 on behalf of the American Civil Liberties Union, as *amicus curiae,* urging reversal.

MR. JUSTICE REED delivered the opinion of the Court.

By writ of certiorari in Nos. 280 and 314 and by appeal in No. 966 we have before us the question of the constitu-

tionality of various city ordinances imposing the license taxes upon the sale of printed matter for nonpayment of which the appellant, Jobin, and the petitioners, Jones, Bowden and Sanders, all members of the organization known as Jehovah's Witnesses, were convicted.

## No. 280

The City of Opelika, Alabama, filed a complaint in the Circuit Court of Lee County, charging petitioner Jones with violation of its licensing ordinance by selling books without a license, by operating as a Book Agent without a license, and by operating as a transient agent, dealer or distributor of books without a license.[1] The license fee for Book Agents (Bibles excepted) was $10 per annum, that for transient agents, dealers or distributors of books $5.[2]

---

[1] "4. Penalties. It shall be unlawful for any person . . . to engage in any of the businesses or vocations for which a license may be required without first having procured a license therefor, and any violation hereof shall constitute a criminal offense, and shall be punishable by fine . . . and by imprisonment.

. . . . .

"9. Persons Engaged In Two or More Vocations. All trades or vocations dealing in two or more of the articles or engaged in two or more of the trades or vocations for which licenses are required by the City, shall pay for and take out licenses for each line of business, calling or vocation.

. . . . .

"12. Vocations Not Specified Herein. Any applicant desiring to conduct any business or vocation other than those specified in this license ordinance shall make application to the President of the Commission, who shall thereon fix a reasonable license for such business or vocation and instruct the Clerk as to the amount so fixed."

[2] "Agents (Annual Only)

Book Agents (Bibles excepted)...................... 10.00

. . . . .

Transient or itinerant agents selling rugs, antiques, goods, wares, merchandise or taking orders for same........ 25.00

. . . . .

Under § 1 of the ordinance, all licenses were subject to revocation in the discretion of the City Commission, with or without notice.[3]   There is a clause providing for severance in case of invalidity of any section, condition or provision.[4] Petitioner demurred, alleging that the ordinance, because of unlimited discretion in revocation and requirement of a license, was an unconstitutional encroachment upon freedom of the press.   During the trial, without a jury, these contentions, with the added claim of interference with freedom of religion, were renewed at the end of the city's case, and at the close of all the evidence.   The court overruled these motions, and found petitioner guilty on evidence that, without a license, he had been displaying pamphlets in his upraised hand and walking on a city street selling them two for five cents.[5]   The court excluded, as irrelevant, testimony designed to show that the petitioner was an ordained minister, and that his activities

---

"Peddlers, or itinerant dealers, distributors or salesmen not otherwise included in this schedule (Annual Only) ....... 75.00

.              .              .              .              .

"Transient Agents or Dealers or Distributors of Books (Annual Only) ................................... 5.00
"Transient Dealers ................................... 25.00
(Not covered heretofore in this schedule, definition same as transient dealer.)

.              .              .              .

"There will be an issuance fee of $0.50 added to and collected on each license."

[3] "1.   Right of City to Revoke.   All licenses, permits or other grants to carry on any business, trade, vocation, or professions for which a charge is made by the City shall be subject to revocation in the discretion of the City Commission, with or without notice to the licensee."

[4] "Should any section, condition, or provision or any rate or amount scheduled as against any particular occupation exhibited in the foregoing schedule be held void or invalid, such invalidity shall not affect any other section, rate or provision of this license schedule."

[5] His wife was selling pamphlets from a portable stand on the sidewalk nearby.

were in furtherance of his beliefs and the teachings of Jehovah's Witnesses. Once again, by an unsuccessful motion for new trial, the constitutional issues were raised. The Court of Appeals of Alabama reversed the conviction on appeal, because it thought the unlimited discretion of the City Commission to revoke the licenses invalidated the ordinance. Without discussion of this point, the Supreme Court of Alabama decided that nondiscriminatory licensing of the sale of books or tracts was constitutional, reversed the Court of Appeals, and stayed execution pending certiorari. 241 Ala. 279, 3 So. 2d 76. This Court, having granted certiorari, 314 U. S. 593, dismissed the writ for lack of a final judgment. 315 U. S. 782. The Court of Appeals thereupon entered a judgment sustaining the conviction, which was affirmed by the Alabama Supreme Court and is final. 242 Ala. 549, 7 So. 2d 503. We therefore grant the petition for rehearing of the dismissal of the writ, and proceed with the consideration of the case.

## No. 314

Petitioners Bowden and Sanders were arrested by police officers of Fort Smith, Arkansas, brought before the Municipal Court on charges of violation of City Ordinance No. 1172, and convicted. They appealed to the Sebastian Circuit Court, and there moved to dismiss on the ground that the ordinance was an unconstitutional restriction of freedom of religion and of the press, contrary to the Fourteenth Amendment. The circuit judge heard the case *de novo* without a jury, on stipulated facts. The ordinance required a license "For each person peddling dry goods, notions, wearing apparel, household goods or other articles not herein or otherwise specifically mentioned $25 per month, $10 per week, $2.50 per day." [6]

[6] "Be it Ordained by the Board of Commissioners of the City of Fort Smith, Arkansas:

"Section 1. That the license hereinafter named shall be fixed and imposed and collected at the following rates and sums and it shall be un-

The petitioners, in the exercise of their beliefs concerning their duty to preach the gospel, admitted going from house to house without a license, playing phonographic transcriptions of Bible lectures, and distributing books setting forth their views to the residents in return for a contribution of twenty-five cents per book. When persons desiring books were unable to contribute, the books were in some instances given away free. The circuit judge concluded as a matter of law that the books were "other articles" and that petitioners were guilty of peddling without a license. A motion for new trial was denied. On appeal the Supreme Court of Arkansas held the ordinance constitutional on the authority of its previous decision in *Cook* v. *Harrison*, 180 Ark. 546, 21 S. W. 2d 966, and affirmed the convictions. 202 Ark. 614, 151 S. W. 2d 1000. This Court denied certiorari, 314 U. S. 651, but later, because of the similarity of the issues presented to those in the *Jobin* case, No. 966, vacated the denial of certiorari and issued a writ. 315 U. S. 793.

## No. 966

The City of Casa Grande, Arizona, by ordinance made it a misdemeanor for any person to carry on any occupation or business specified without first procuring a license.[7]

lawful for any person or persons to exercise or pursue any of the following vocations of business in the city of Fort Smith, Arkansas, without first having obtained a license therefor from the city clerk and having paid for the same. . . .

"Section 40. For each person peddling dry goods, notions, wearing apparel, household goods or other articles not herein or otherwise specifically mentioned $25 per month, $10 per week, $2.50 per day. A person, firm or corporation using two or more men in their peddling business $50 per annum."

[7] "Section 1. It shall be unlawful for any person . . . to carry on any trade, calling, profession, occupation or business, in this ordinance specified, without first having procured a license from the City of Casa Grande, so to do, . . . and each and every day or fractional part of a

Transient merchants, peddlers and street vendors were listed as subject to a quarterly license fee of $25.00, payable in advance.[8]  In the Superior Court of Pinal County, Jobin was tried and convicted by a jury on a complaint charging that, not having "a permanent place of business in the City," he there carried on the "business of peddling, vending, selling, offering for sale and soliciting the sale of

day that any trade, calling, profession, business or occupation in this ordinance specified is conducted or carried on without such license shall be a misdemeanor, . . .

"Section 2.  It shall be the duty of the City Clerk . . . to prepare and to issue a license under this ordinance for every person . . . liable to pay a license hereunder. . . .

"Section 4.  . . . Every person having such a license, and not having a fixed place of business shall carry such license with him at all times while carrying on the trade . . . or business for which the same was granted.  Every person . . . having a license . . . shall produce and exhibit the same, . . . whenever requested to do so by any police officer or by any other officer authorized to issue, inspect or collect licenses."

[8] "Section 12.  Peddlers, Transient Merchants, Vendors, defined:

(A)  'Transient Merchant' within the meaning of this ordinance shall include every person who, not for or in connection with a business at a fixed place within the City of Casa Grande, solicits orders from house to house for the future delivery of goods, or who shall deliver goods previously solicited by a solicitor at retail, or an order for future delivery.

(B)  As used in this ordinance, the term 'peddlers' shall include solicitors and other vendors not having a permanent place of business in the City of Casa Grande, and who are not specifically licensed or permitted to sell any class of goods whatsoever.

(C)  As used in this ordinance, the term 'Street Vendors' includes all persons engaged in selling in or upon the streets, alleys or vacant grounds within the City, any goods, wares, merchandise or articles, including photographs, and also includes all persons engaged in conducting upon the streets, alleys, or vacant grounds of the City any ring, knife or similar game, or any 'faker' business, game or device.

All persons coming within the definition of the occupations defined herein shall pay a quarterly license fee of Twenty Five Dollars ($25.00), in advance."

goods, wares and merchandise, to wit: pamphlets, books and publications without first having procured a license," contrary to the ordinance. The evidence for the State showed that, without a license, the appellant called at two homes and a laundry, and offered for sale and sold books and pamphlets of a religious nature. At one home, accompanied by his wife, he was refused admission, but was allowed by the girl who came to the door to play a portable phonograph on the porch. The girl purchased one of his stock of books, "Religion," for a quarter, and received a pamphlet free. During the conversation, he stated that he was an ordained minister preaching the gospel, and quoted passages from the Bible. At the second home, the lady of the house allowed him and his wife to enter and play the phonograph, but she refused to buy either books or pamphlets. When departing the appellant left some literature on the table, although informed by the lady that it would not be read and had better be given to someone else. At the laundry, the appellant introduced himself as one of the Jehovah's Witnesses and discussed with the proprietor their work and religion generally. The proprietor bought the book "Religion" for a quarter, but declined to buy others at the same price. He was given a pamphlet free. When arrested, the appellant stated that he was "selling religious books and preaching the gospel of the kingdom," and that because of his religious beliefs he would not take out a license. A motion at the close of the evidence for a directed verdict of acquittal, on the ground that the ordinance violated the Fourteenth Amendment, was denied. The jury was instructed to acquit unless it found the defendant was selling books or pamphlets. It returned a verdict of guilty. On appeal, the Supreme Court of Arizona held that the ordinance, an "ordinary occupational license tax ordinance," did not deny freedom of religion and of the press, and affirmed the conviction. 118 P. 2d 97. An appeal to this Court

was allowed under § 237 of the Judicial Code, 28 U. S. C. § 344.

---

The Opelika ordinance required book agents to pay $10.00 per annum, transient distributors of books (annual only) $5.00. The license fee in Casa Grande was $25 per quarter, that in Fort Smith ranged from $2.50 per day to $25 per month. All the fees were small, yet substantial. But the appellant and the petitioners, so far as the records disclose, advanced no claim and presented no proof in the courts below that these fees were invalid because so high as to make the cost of compliance a deterrent to the further distribution of their literature in those cities. Although petitioners in No. 314 contended that their enterprise was operated at a loss, there was no suggestion that they could not obtain from the same sources which now supply the funds to meet whatever deficit there may be, sums sufficient to defray license fees also. The amount of the fees was not considered in the opinions below, except for a bare statement by the Alabama court that the exaction was "reasonable," and neither the briefs nor the assignments of error in this Court have directed their attack specifically to that issue. Consequently there is not before us the question of the power to lay fees, objectionable in their effect because of their size, upon the constitutionally protected rights of free speech, press or the exercise of religion. If the size of the fees were to be considered, to reach a conclusion one would desire to know the estimated volume, the margin of profit, the solicitor's commission, the expense of policing and other pertinent facts of income and expense. In the circumstances, we venture no opinion concerning the validity of license taxes if it were proved, or at least distinctly claimed, that the burden of the tax was a substantial clog upon activities of the sort here involved.[9] The

---

[9] Cf. *Seaboard Air Line Ry. Co.* v. *Watson*, 287 U. S. 86; *New York* v. *Kleinert*, 268 U. S. 646; *Dewey* v. *Des Moines*, 173 U. S. 193; and

sole constitutional question considered is whether a nondiscriminatory license fee, presumably appropriate in amount, may be imposed upon these activities.

We turn to the constitutional problem squarely presented by these ordinances. There are ethical principles of greater value to mankind than the guarantees of the Constitution, personal liberties which are beyond the power of government to impair. These principles and liberties belong to the mental and spiritual realm, where the judgments and decrees of mundane courts are ineffective to direct the course of man. The rights of which our Constitution speaks have a more earthy quality. They are not absolutes [10] to be exercised independently of other cherished privileges, protected by the same organic instrument. Conflicts in the exercise of rights arise, and the conflicting forces seek adjustments in the courts, as do these parties, claiming on the one side the freedom of religion, speech and the press, guaranteed by the Fourteenth Amendment,[11] and on the other the right to employ the sovereign power explicitly reserved to the State by the Tenth Amendment to ensure orderly living, without which constitutional guarantees of civil liberties would be a mockery.[12] Courts, no more than Constitutions, can intrude into the consciences of men or compel them to believe contrary to their faith or think contrary

*Clark* v. *Paul Gray, Inc.*, 306 U. S. 583; *Standard Stock Food Co.* v. *Wright*, 225 U. S. 540.

[10] *Valentine* v. *Chrestensen, ante,* 52, 54–55; *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 571, and cases cited; *Minersville School District* v. *Gobitis,* 310 U. S. 586, 594; *Cantwell* v. *Connecticut,* 310 U. S. 296, 304, 310; *Schneider* v. *State,* 308 U. S. 147, 165; *Hague* v. *C. I. O.,* 307 U. S. 496, 515–516; *De Jonge* v. *Oregon,* 299 U. S. 353, 364.

[11] *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 570–571; *Cantwell* v. *Connecticut,* 310 U. S. 296, 303; *Schneider* v. *State,* 308 U. S. 147, 160; *Lovell* v. *Griffin,* 303 U. S. 444, 450; *Gitlow* v. *New York,* 268 U. S. 652.

[12] *Cox* v. *New Hampshire,* 312 U. S. 569, 574; *Home Bldg. & L. Assn.* v. *Blaisdell,* 290 U. S. 398, 435.

to their convictions; but courts are competent to adjudge the acts men do under color of a constitutional right, such as that of freedom of speech or of the press or the free exercise of religion, and to determine whether the claimed right is limited by other recognized powers, equally precious to mankind.[13]  So the mind and spirit of man remain forever free, while his actions rest subject to necessary accommodation to the competing needs of his fellows.

If all expression of religion or opinion, however, were subject to the discretion of authority, our unfettered dynamic thoughts or moral impulses might be made only colorless and sterile ideas.  To give them life and force, the Constitution protects their use.  No difference of view as to the importance of the freedoms of press or religion exists.  They are "fundamental personal rights and liberties." *Schneider* v. *State*, 308 U. S. 147, 161.  To proscribe the dissemination of doctrines or arguments which do not transgress military or moral limits is to destroy the principal bases of democracy,—knowledge and discussion.  One man, with views contrary to the rest of his compatriots, is entitled to the privilege of expressing his ideas by speech or broadside to anyone willing to listen or to read.  Too many settled beliefs have in time been rejected to justify this generation in refusing a hearing to its own dissentients.  But that hearing may be limited by action of the proper legislative body to times, places and methods for the enlightenment of the community which, in view of existing social and economic conditions, are not at odds with the preservation of peace and good order.

This means that the proponents of ideas cannot determine entirely for themselves the time and place and manner for the diffusion of knowledge or for their evangelism, any more than the civil authorities may hamper or suppress the public dissemination of facts and prin-

---

[13] *Cantwell* v. *Connecticut*, 310 U. S. 296, 303; *Reynolds* v. *United States*, 98 U. S. 145, 166.

ciples by the people.[14] The ordinary requirements of civilized life compel this adjustment of interests. The task of reconcilement is made harder by the tendency to accept as dominant any contention supported by a claim of interference with the practice of religion or the spread of ideas. Believing, as this Nation has from the first, that the freedoms of worship and expression are closely akin to the illimitable privileges of thought itself, any legislation affecting those freedoms is scrutinized to see that the interferences allowed are only those appropriate to the maintenance of a civilized society. The determination of what limitations may be permitted under such an abstract test rests with the legislative bodies, the courts, the executive, and the people themselves, guided by the experience of the past, the needs of revenue for law enforcement, the requirements and capacities of police protection, the dangers of disorder, and other pertinent factors.

Upon the courts falls the duty of determining the validity of such enactments as may be challenged as unconstitutional by litigants.[15] In dealing with these delicate adjustments, this Court denies any place to administrative censorship of ideas or capricious approval of distributors. In *Lovell* v. *Griffin*, 303 U. S. 444, the requirement of permission from the city manager invalidated the ordinance, pp. 447 and 451; in *Schneider* v. *State*, that of a police officer, pp. 157 and 163. In the *Cantwell* case, the secretary of the public welfare council was to determine whether the object of charitable solicitation was worthy, p. 302. We held the requirement bad.[16] Ordinances abso-

---

[14] *Cox* v. *New Hampshire*, 312 U. S. 569, 573, 576; *Cantwell* v. *Connecticut*, 310 U. S. 296, 306; *Schneider* v. *State*, 308 U. S. 147, 160.

[15] Cf. *Schneider* v. *State, supra*, 161.

[16] Cf. *Hague* v. *C. I. O.*, 307 U. S. 496, 516.

lutely prohibiting the exercise of the right to disseminate
information are, *a fortiori*, invalid.[17]

The differences between censorship and complete prohi-
bition, either of subject matter or the individuals partici-
pating, upon the one hand, and regulation of the conduct
of individuals in the time, manner and place of their activ-
ities upon the other, are decisive. "One who is a martyr to
a principle . . . does not prove by his martyrdom that
he has kept within the law," said Mr. Justice Cardozo,
concurring in *Hamilton* v. *Regents,* 293 U. S. 245, 268,
which held that conscientious objection to military train-
ing would not excuse a student, during his enrollment,
from attending required courses in that science.[18] There
is to be noted, too, a distinction between nondiscrimina-
tory regulation of operations which are incidental to the
exercise of religion or the freedom of speech or the press
and those which are imposed upon the religious rite itself
or the unmixed dissemination of information. Casual
reflection verifies the suggestion that both teachers and
preachers need to receive support for themselves as well
as alms and benefactions for charity and the spread of
knowledge. But when, as in these cases, the practitioners
of these noble callings choose to utilize the vending of
their religious books and tracts as a source of funds, the
financial aspects of their transactions need not be wholly
disregarded. To subject any religious or didactic group to
a reasonable fee for their money-making activities does
not require a finding that the licensed acts are purely com-
mercial. It is enough that money is earned by the sale

[17] *Hague* v. *C. I. O.,* 307 U. S. 496, 501, 518, invalidates an ordinance
forbidding any person to "distribute or cause to be distributed or
strewn about any street or public place any newspapers, paper,
periodical, book, magazine, circular, card, or pamphlet," p. 501;
*Schneider* v. *State,* 308 U. S. 147, 162, holds similar prohibitory ordi-
nances unconstitutional.

[18] Cf. *City of Manchester* v. *Leiby,* 117 F. 2d 661, requirement of
badge for street selling of books, papers or pamphlets.

of articles. A book agent cannot escape a license require-
ment by a plea that it is a tax on knowledge. It would
hardly be contended that the publication of newspapers
is not subject to the usual governmental fiscal exactions,
*Giragi* v. *Moore,* 301 U. S. 670; 48 Ariz. 33, 58 P. 2d 1249;
49 Ariz. 74, 64 P. 2d 819, or the obligations placed by stat-
utes on other business. *Associated Press* v. *Labor Board,*
301 U. S. 103, 130. The Constitution draws no line be-
tween a payment from gross receipts or a net income tax
and a suitably calculated occupational license. Commer-
cial advertising cannot escape control by the simple ex-
pedient of printing matter of public interest on the same
sheet or handbill. *Valentine* v. *Chrestensen, ante,* p. 52.
Nor does the fact that to the participants a formation in
the streets is an "information march," and "one of their
ways of worship," suffice to exempt such a procession from
a city ordinance which, narrowly construed, required a
license for such a parade.[19]

When proponents of religious or social theories use
the ordinary commercial methods of sales of articles to
raise propaganda funds, it is a natural and proper exercise
of the power of the State to charge reasonable fees for
the privilege of canvassing. Careful as we may and
should be to protect the freedoms safeguarded by the Bill
of Rights, it is difficult to see ·in such enactments a
shadow of prohibition of the exercise of religion or of
abridgément of the freedom of speech or the press. It is
prohibition and unjustifiable abridgement which are in-
terdicted, not taxation. Nor do we believe it can be fairly
said that because such proper charges may be expanded
into unjustifiable abridgements they are therefore invalid
on their face. The freedoms claimed by those seeking re-
lief here are guaranteed against abridgement by the Four-
teenth Amendment. Its commands protect their rights.
The legislative power of municipalities must yield when

---

[19] *Cox* v. *New Hampshire,* 312 U. S. 569, 572, 573, 576.

abridgement is shown. Compare *Grosjean* v. *American Press Co.*, 297 U. S. 233, with *Giragi* v. *Moore*, 301 U. S. 670. If we were to assume, as is here argued, that the licensed activities involve religious rites, a different question would be presented. These are not taxes on free will offerings. But it is because we view these sales as partaking more of commercial than religious or educational transactions that we find the ordinances, as here presented, valid. A tax on religion or a tax on interstate commerce may alike be forbidden by the Constitution. It does not follow that licenses for selling Bibles or for manufacture of articles of general use, measured by extrastate sales, must fall. It may well be that the wisdom of American communities will persuade them to permit the poor and weak to draw support from the petty sales of religious books without contributing anything for the privilege of using the streets and conveniences of the municipality. Such an exemption, however, would be a voluntary, not a constitutionally enforced, contribution.

In the ordinances of Casa Grande and Fort Smith, we have no discretionary power in the public authorities to refuse a license to any one desirous of selling religious literature. No censorship of the material which enters into the books or papers is authorized. No religious symbolism is involved, such as was urged against the flag salute in *Minersville School District* v. *Gobitis,* 310 U. S. 586. For us there is no occasion to apply here the principles taught by that opinion. Nothing more is asked from one group than from another which uses similar methods of propagation. We see nothing in the collection of a nondiscriminatory license fee, uncontested in amount, from those selling books or papers, which abridges the freedoms of worship, speech or press. Cf. *Grosjean* v. *American Press Co.,* 297 U. S. 233, 250. As to the claim that even small license charges, if valid, will impose upon the itinerant colporteur a crushing ag-

gregate, it is plain that if each single fee is, as we assume, commensurate with the activities licensed, then though the accumulation of fees from city to city may in time bulk large, he will have enjoyed a correlatively enlarged field of distribution. Cf. *Coverdale* v. *Pipe Line Co.*, 303 U. S. 604, 612–613. The First Amendment does not require a subsidy in the form of fiscal exemption. *Giragi* v. *Moore, supra.* Accordingly, the challenge to the Fort Smith and Casa Grande ordinances fails.

There is an additional contention by petitioner as to the Opelika ordinance. It is urged that, since the licenses were revocable, arbitrarily, by the local authorities, note 3, *supra,* there can be no true freedom for petitioners in the dissemination of information, because of the censorship upon their actions after the issuance of the license. But there has been neither application for, nor revocation of, a license. The complaint was bottomed on sales without a license. It was that charge against which petitioner claimed the protection of the Constitution. This issue he had standing to raise. *Smith* v. *Cahoon*, 283 U. S. 553, 562. From what has been said previously, it follows that the objection to the unconstitutionality of requiring a license fails. There is no occasion, at this time, to pass on the validity of the revocation section, as it does not affect his present defense. *Highland Farms Dairy* v. *Agnew,* 300 U. S. 608, 616; *Lehon* v. *City of Atlanta,* 242 U. S. 53, 56.

In *Lovell* v. *Griffin,* 303 U. S. 444, we held invalid a statute which placed the grant of a license within the discretion of the licensing authority. By this discretion, the right to obtain a license was made an empty right. Therefore the formality of going through an application was naturally not deemed a prerequisite to insistence on a constitutional right. Here we have a very different situation. A license is required that may properly be required. The fact that such a license, if it were granted, may subse-

quently be revoked does not necessarily destroy the licensing ordinance. The hazard of such revocation is much too contingent for us now to declare the licensing provisions to be invalid. *Lovell* v. *Griffin* has, in effect, held that discretionary control in the general area of free speech is unconstitutional. Therefore, the hazard that the license properly granted would be improperly revoked is far too slight to justify declaring the valid part of the ordinance, which is alone now at issue, also unconstitutional.

The judgments in Nos. 280, 314 and 966 are

*Affirmed.*

Mr. Chief Justice Stone:

The First Amendment, which the Fourteenth makes applicable to the states, declares: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press." I think that the ordinance in each of these cases is on its face a prohibited invasion of the freedoms thus guaranteed, and that the judgment in each should be reversed.

The ordinance in the *Opelika* case should be held invalid on two independent grounds. One is that the annual tax in addition to the 50 cent "issuance fee" which the ordinance imposes is an unconstitutional restriction on those freedoms, for reasons which will presently appear. The other is that the requirement of a license for dissemination of ideas, when, as here, the license is revocable at will without cause and in the unrestrained discretion of administrative officers, is likewise an unconstitutional restraint on those freedoms.

The sole condition which the Opelika ordinance prescribes for grant of the license is payment of the designated annual tax and issuance fee. The privilege thus purchased, for the period of a year, is forthwith revocable in the unrestrained and unreviewable discretion of the

licensing commission, without cause and without notice or opportunity for a hearing. The case presents in its baldest form the question whether the freedoms which the Constitution purports to safeguard can be completely subjected to uncontrolled administrative action. Only recently this Court was unanimous in holding void on its face the requirement of a license for the distribution of pamphlets which was to be issued in the sole discretion of a municipal officer. *Lovell* v. *Griffin,* 303 U. S. 444, 451. The precise ground of our decision was that the ordinance made enjoyment of the freedom which the Constitution guarantees contingent upon the uncontrolled will of administrative officers. We declared:

"We think that the ordinance is invalid on its face. Whatever the motive which induced its adoption, its character is such that it strikes at the very foundation of the freedom of the press by subjecting it to license and censorship. The struggle for the freedom of the press was primarily directed against the power of the licensor. It was against that power that John Milton directed his assault by his 'Appeal for the Liberty of Unlicensed Printing.' And the liberty of the press became initially a right to publish *'without* a license what formerly could be published only *with* one.' While this freedom from previous restraint upon publication cannot be regarded as exhausting the guaranty of liberty, the prevention of that restraint was a leading purpose in the adoption of the constitutional provision."

That purpose cannot rightly be defeated by so transparent a subterfuge as the pronouncement that, while a license may not be required if its award is contingent upon the whim of an administrative officer, it may be if its retention and the enjoyment of the privilege which it purports to give are wholly contingent upon his whim. In either case, enjoyment of the freedom is dependent upon the same contingency, and the censorship is as effective in

one as in the other. Nor is any palliative afforded by the assertion that the defendant's failure to apply for a license deprives him of standing to challenge the ordinance because of its revocation provision, by the terms of which retention of the license and exercise of the privilege may be cut off at any time without cause.

Indeed, the present ordinance is a more callous disregard of the constitutional right than that exhibited in *Lovell* v. *Griffin, supra.* There at least the defendant might have been given a license if he had applied for it. In any event he would not have been compelled to pay a money exaction for a license to exercise the privilege of free speech—a license which if granted in this case would have been wholly illusory. Here the defendant Jones was prohibited from distributing his pamphlets at all, unless he paid in advance a year's tax for the exercise of the privilege and subjected himself to termination of the license without cause, notice or hearing, at the will of city officials. To say that he who is free to withhold at will the privilege of publication exercises a power of censorship prohibited by the Constitution, but that he who has unrestricted power to withdraw the privilege does not, would be to ignore history and deny the teachings of experience, as well as to perpetuate the evils at which the First Amendment was aimed.

It is of no significance that the defendant did not apply for a license. As this Court has often pointed out, when a licensing statute is on its face a lawful exercise of regulatory power, it will not be assumed that it will be unlawfully administered in advance of an actual denial of application for the license. But here it is the prohibition of publication, save at the uncontrolled will of public officials, which transgresses constitutional limitations and makes the ordinance void on its face. The Constitution can hardly be thought to deny to one subjected to the restraints of such an ordinance the right to attack its constitutionality, because he has not yielded to its demands. *Lovell* v.

*Griffin, supra,* 452–53; *Smith* v. *Cahoon,* 283 U. S. 553, 562. The question of standing to raise the issue in this case is indistinguishable from that in the *Lovell* case, where it was resolved in the only manner consistent with the First Amendment.

The separability provision of the Opelika ordinance [1] cannot serve, in advance of judicial decision by the state court, to separate those parts which are constitutionally applicable from those which are not. We have no means of knowing that the City would grant any license if the license could not be made revocable at will. The state court applied the ordinance as written. It did not rely or pass upon the effect to be given to the separability clause, or determine whether any effect was to be given to it. Until it has done so, this Court—as we decided only last Monday—must determine the constitutional validity of the ordinance as it stands and as it stood when obedience to it was demanded and punishment for its violation inflicted. *Skinner* v. *Oklahoma, ante,* p. 535; *Smith* v. *Cahoon, supra,* 563–64.

In all three cases the question presented by the record and fully argued here and below is whether the ordinances—which as applied penalize the defendants for not having paid the flat fee taxes levied—violate the freedom' of speech, press, and religion guaranteed by the First and Fourteenth Amendments. Defendants' challenge to the ordinances, naming them, is a challenge to the substantial taxes which they impose, in specified amounts, and not to some tax of a different or lesser amount which some other ordinance might levy. In their briefs here they argue, as upon the records they are entitled to do, that the taxes are an unconstitutional burden on the right of

---

[1] "Should any section, condition, or provision or any rate or amount scheduled as against any particular occupation exhibited in the foregoing schedule be held void or invalid, such invalidity shall not effect any other section, rate or provision of this license schedule."

free speech and free religion, comparable to license taxes which this Court has often held to be an inadmissible burden on interstate commerce. They argue also that the cumulative effect of such taxes, in town after town throughout the country, would be destructive of freedom of the press for all persons except those financially able to distribute their literature without soliciting funds for the support of their cause.

While these are questions which have been studiously left unanswered by the opinion of the Court, it seems inescapable that an answer must be given before the convictions can be sustained. Decision of them cannot rightly be avoided now by asserting that the amount of the tax has not been put in issue; that the tax is "uncontested in amount" by the defendants, and can therefore be assumed by us to be "presumably appropriate," "reasonable," or "suitably calculated"; that it has not been proved that the burden of the tax is a substantial clog on the activities of the defendants, or that those who have defrayed the expense of their religious activities will not willingly defray the license taxes also. All these are considerations which would seem to be irrelevant to the question now before us—whether a flat tax, more than a nominal fee to defray the expenses of a regulatory license, can constitutionally be laid on a non-commercial, non-profit activity devoted exclusively to the dissemination of ideas, educational and religious in character, to those persons who consent to receive them.

Nor is the essential issue here disguised by the reiterated characterization of these exactions, not as taxes but as "fees"—a characterization to which the records lend no support. All these ordinances on their face purport to be an exercise of the municipality's taxing power. In none is there the slightest pretense by the taxing authority, or the slightest suggestion by the state court, that the "fee" is to defray expenses of the licensing system. The

amounts of the "fees," without more, demonstrate that such a contention is groundless. In No. 280, Opelika itself contends that the issue relates solely to its power to raise money for general revenue purposes, and the Supreme Court of Alabama referred to the levy as a "reasonable" "tax." The tax exacted by Opelika, on the face of the ordinance, is in addition to a 50 cent "issuance fee," which alone is presumably what the city deems adequate to defray the cost of administering the licensing system. Similarly in the *Fort Smith* and *Casa Grande* cases, the state courts sustained the ordinances as a tax, and nothing else. If this litigation has involved any controversy—and the state courts all seemed to think that it did—the controversy has been one solely relating to the power to tax, and not the power to collect a "fee" to support a licensing system which, as has already been indicated, has no regulatory purpose other than that involved in the raising of revenue.

This Court has often had occasion to point out that where the State may, as a regulatory measure, license activities which it is without constitutional authority to tax, it may charge a small or nominal fee sufficient to defray the expense of licensing, and similarly it may charge a reasonable fee for the use of its highways by interstate motor traffic which it cannot tax. Compare *Clark* v. *Paul Gray, Inc.,* 306 U. S. 583, 598–600, with *Ingels* v. *Morf,* 300 U. S. 290, and cases cited; see *Cox* v. *New Hampshire,* 312 U. S. 569, 576–77. But we are not concerned in these cases with a nominal fee for a regulatory license, which may be assumed, for argument's sake, to be valid. Here the licenses are not regulatory, save as the licenses conditioned upon payment of the tax may serve to restrain or suppress publication. None of the ordinances, if complied with, purports to, or could, control the time, place or manner of the distribution of the books and pamphlets concerned. None has any discernible relationship to the

police protection or the good order of the community. The only condition and purpose of the licenses under all three ordinances is suppression of the specified distributions of literature in default of the payment of a substantial tax fixed in amount and measured neither by the extent of the defendants' activities under the license nor the amounts which they receive for and devote to religious purposes in the exercise of the licensed privilege. Opelika exacts a license fee for book agents of $10 per annum, and of $5 per annum for transient distributors of books, in addition to a 50 cent "issuance fee" on each license. The Supreme Court of Alabama found it unnecessary to determine whether both or only one of these taxes was payable by defendant Jones. The Fort Smith tax of $25 a month, or $10 a week, or $2.50 a day is substantial in amount for transient distributors of literature of the character here involved; the Opelika exaction is even more onerous when applied against one who may be in the city for only a day or two; and the tax of $25 per quarter exacted by the Casa Grande ordinance, adopted in a community having an adult population of less than 1,000 and applied to distributions of literature like the present, is prohibitive in effect.

In considering the effect of such a tax on the defendants' activities, it is important to note that the state courts have applied levies obviously devised for the taxation of business employments—in the first case the "business or vocation" of "book agent"; in the second the business of peddling specified types of merchandise or "other articles"; in the third, the practice of the callings of "peddlers, transient merchants and vendors"—to activities which concededly are not ordinary business or commercial transactions. As appears by stipulation or undisputed testimony, the defendants are Jehovah's Witnesses, engaged in spreading their religious doctrines in conformity to the teachings of St. Matthew, Matt. 10:11–14 and

24:14, by going from city to city, from village to village, and house to house, to proclaim them. After asking and receiving permission from the householder, they play to him phonograph records and tender to him books or pamphlets advocating their religious views. For the latter they ask payment of a nominal amount, two to five cents for the pamphlets and twenty-five cents for books, as a contribution to the religious cause which they seek to advance. But they distribute the pamphlets, and sometimes the books, gratis when the householder is unwilling or unable to pay for them. The literature is published for such distribution by non-profit charitable corporations organized by Jehovah's Witnesses. The funds collected are used for the support of the religious movement, and no one derives a profit from the publication and distribution of the literature. In the *Opelika* case, the defendant's activities were confined to distribution of literature and solicitation of funds in the public streets.

No one could doubt that taxation which may be freely laid upon activities not within the protection of the Bill of Rights could, when applied to the dissemination of ideas, be made the ready instrument for destruction of that right. Few would deny that a license tax laid specifically on the privilege of disseminating ideas would infringe the right of free speech. For one reason among others, if the State may tax the privilege it may fix the rate of tax and, through the tax, control or suppress the activity which it taxes. *Magnano Co.* v. *Hamilton*, 292 U. S. 40, 45; *Grosjean* v. *American Press Co.*, 297 U. S. 233, 244–45. If the distribution of the literature had been carried on by the defendants without solicitation of funds, there plainly would have been no basis, either statutory or constitutional, for levying the tax. It is the collection of funds which have been seized upon to justify the extension, to the defendants' activities, of the tax laid upon business callings. But if we assume, despite our recent

decision in *Schneider* v. *State*, 308 U. S. 147, 163, that the essential character of these activities is in some measure altered by the collection of funds for the support of a religious undertaking, still it seems plain that the operation of the present flat tax is such as to abridge the privileges which the defendants here invoke.

It lends no support to the present tax to insist that its restraint on free speech and religion is non-discriminatory because the same levy is made upon business callings carried on for profit, many of which involve no question of freedom of speech and religion and all of which involve commercial elements—lacking here—which for present purposes may be assumed to afford a basis for taxation apart from the exercise of freedom of speech and religion. The constitutional protection of the Bill of Rights is not to be evaded by classifying with business callings an activity whose sole purpose is the dissemination of ideas, and taxing it as business callings are taxed. The immunity which press and religion enjoy may sometimes be lost when they are united with other activities not immune. *Valentine* v. *Chrestensen, ante,* p. 52. But, here, the only activities involved are the dissemination of ideas, educational and religious, and the collection of funds for the propagation of those ideas, which we have said is likewise the subject of constitutional protection. *Schneider* v. *State, supra; Cantwell* v. *Connecticut,* 310 U. S. 296, 304–07.

The First Amendment is not confined to safeguarding freedom of speech and freedom of religion against discriminatory attempts to wipe them out. On the contrary, the Constitution, by virtue of the First and the Fourteenth Amendments, has put those freedoms in a preferred position. Their commands are not restricted to cases where the protected privilege is sought out for attack. They extend at least to every form of taxation which, because it is a condition of the exercise of the privilege, is capable of being used to control or suppress it.

Even were we to assume—what I do not concede—that there could be a lawful non-discriminatory license tax of a percentage of the gross receipts collected by churches and other religious orders in support of their religious work, cf. *Giragi* v. *Moore,* 301 U. S. 670, we have no such tax here. The tax imposed by the ordinances in these cases is more burdensome and destructive of the activity taxed than any gross receipts tax. The tax is for a fixed amount, unrelated to the extent of the defendants' activities or the receipts derived from them. It is thus the type of flat tax which, when applied to interstate commerce, has repeatedly been deemed by this Court to be prohibited by the commerce clause. See *McGoldrick* v. *Berwind-White Co.,* 309 U. S. 33, 55–57, and cases cited; cf. *Best & Co.* v. *Maxwell,* 311 U. S. 454, 456. When applied, as it is here, to activities involving the exercise of religious freedom, its vice is emphasized in that it is levied and paid in advance of the actvities taxed, and applied at rates well calculated to suppress those activities, save only as others may volunteer to pay the tax. It requires a sizable out-of-pocket expense by someone who may never succeed in raising a penny in his exercise of the privilege which is taxed.

The defendants' activities, if taxable at all, are taxable only because of the funds which they solicit. But that solicitation is for funds for religious purposes, and the present taxes are in no way gauged to the receipts. The taxes are insupportable either as a tax on the dissemination of ideas or as a tax on the collection of funds for religious purposes. For on its face a flat license tax restrains in advance the freedom taxed and tends inevitably to suppress its exercise. The First Amendment prohibits all laws abridging freedom of press and religion, not merely some laws or all except tax laws. It is true that the constitutional guaranties of freedom of press and religion, like the commerce clause, make no distinction between fixed-sum

taxes and other kinds. But that fact affords no excuse for courts, whose duty it is to enforce those guaranties, to close their eyes to the characteristics of a tax which render it destructive of freedom of press and religion.

We may lay to one side the Court's suggestion that a tax otherwise unconstitutional is to be deemed valid unless it is shown that there are none who, for religion's sake, will come forward to pay the unlawful exaction. The defendants to whom the ordinances have been applied have not paid it and there is nothing in the Constitution to compel them to seek the charity of others to pay it before protesting the tax. It seems fairly obvious that if the present taxes, laid in small communities upon peripatetic religious propagandists, are to be sustained, a way has been found for the effective suppression of speech and press and religion despite constitutional guaranties. The very taxes now before us are better adapted to that end than were the stamp taxes which so successfully curtailed the dissemination of ideas by eighteenth century newspapers and pamphleteers, and which were a moving cause of the American Revolution. See Collett, History of the Taxes on Knowledge, vol. 1, c. 1; May, Constitutional History of England, 7th ed., vol. 2, p. 245; Hanson, Government and the Press, 1695–1763, pp. 7–14; Morison, The English Newspaper, 1622–1932, pp. 83–88; *Grosjean* v. *American Press Co.*, *supra*, 245–49. Vivid recollections of the effect of those taxes on the freedom of press survived to inspire the adoption of the First Amendment.

Freedom of press and religion, explicitly guaranteed by the Constitution, must at least be entitled to the same freedom from burdensome taxation which it has been thought that the more general phraseology of the commerce clause has extended to interstate commerce. Whatever doubts may be entertained as to this Court's function to relieve, unaided by Congressional legislation, from burdensome taxation under the commerce clause, see *Gwin*,

*White & Prince, Inc.* v. *Henneford,* 305 U. S. 434, 441, 446–55; *McCarroll* v. *Dixie Lines,* 309 U. S. 176, 184–85, it cannot be thought that that function is wanting under the explicit guaranties of freedom of speech, press and religion. In any case, the flat license tax can hardly become any the less burdensome or more permissible, when levied on activities within the protection extended by the First and Fourteenth Amendments both to the orderly communication of ideas, educational and religious, to persons willing to receive them, see *Cantwell* v. *Connecticut, supra,* and to the practice of religion and the solicitation of funds in its support. *Schneider* v. *State, supra.*

In its potency as a prior restraint on publication, the flat license tax falls short only of outright censorship or suppression. The more humble and needy the cause, the more effective is the suppression.

MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS and MR. JUSTICE MURPHY join in this opinion.

MR. JUSTICE MURPHY, with whom the CHIEF JUSTICE, MR. JUSTICE BLACK, and MR. JUSTICE DOUGLAS concur, dissenting.

When a statute is challenged as impinging on freedom of speech, freedom of the press, or freedom of worship, those historic privileges which are so essential to our political welfare and spiritual progress, it is the duty of this Court to subject such legislation to examination, in the light of the evidence adduced, to determine whether it is so drawn as not to impair the substance of those cherished freedoms in reaching its objective. Ordinances that may operate to restrict the circulation or dissemination of ideas on religious or other subjects should be framed with fastidious care and precise language to avoid undue encroachment on these fundamental liberties. And the protection of the Constitution must be extended to all, not

only to those whose views accord with prevailing thought but also to dissident minorities who energetically spread their beliefs. Being satisfied by the evidence that the ordinances in the cases now before us, as construed and applied in the state courts, impose a burden on the circulation and discussion of opinion and information in matters of religion, and therefore violate the petitioners'[1] rights to freedom of speech, freedom of the press, and freedom of worship in contravention of the Fourteenth Amendment, I am obliged to dissent from the opinion of the Court.

It is not disputed that petitioners, Jehovah's Witnesses, were ordained ministers preaching the gospel, as they understood it, through the streets and from house to house, orally and by playing religious records with the consent of the householder, and by distributing books and pamphlets setting forth the tenets of their faith. It does not appear that their motives were commercial, but only that they were evangelizing their faith as they saw it.

In No. 280 the trial court excluded as irrelevant petitioner's testimony that he was an ordained minister and that his activities on the streets of Opelika were in furtherance of his ministerial duties. The testimony of ten clergymen of Opelika that they distributed free religious literature in their churches, the cost of which was defrayed by voluntary contribution, and that they had never been forced to pay any license fee, was also excluded. It is admitted here that petitioner was a Jehovah's Witness and considered himself an ordained minister.

The Supreme Court of Arizona stated in No. 966 that appellant was "a regularly ordained minister of the denomination commonly known as Jehovah's Witnesses . . . going from house to house in the city of Casa Grande preaching the gospel, as he understood it, by means of his

---

[1] For convenience, appellant in No. 966, petitioners in No. 314, and petitioner in No. 280 are herein collectively referred to as "petitioners."

spoken word, by playing various religious records on a phonograph, with the approval of the householder, and by distributing printed books, pamphlets and tracts which set forth his views as to the meaning of the Bible. The method of distribution of these printed books, pamphlets and tracts was as follows: He first offered them for sale at various prices ranging from five to twenty-five cents each. If the householder did not desire to purchase any of them he then left a small leaflet summarizing some of the doctrines which he preached." 118 P. 2d 97, 98.

The facts were stipulated in No. 314. Each petitioner "claims to be an ordained minister of the gospel . . . They do not engage in this work for any selfish reason but because they feel called to publish the news and preach the gospel of the kingdom to all the world as a witness before the end comes. . . . They believe that the only effective way to preach is to go from house to house and make personal contact with the people and distribute to them books and pamphlets setting forth their views on Christianity." Petitioners "were going from house to house in the residential section within the city of Fort Smith . . . presented to the residents of these houses various booklets, leaflets and periodicals setting forth their views of Christianity held by Jehovah's Witnesses." They solicited "a contribution of twenty-five cents for each book," but "these books in some instances are distributed free when the people wishing them are unable to contribute." 151 S. W. 2d 1000, 1001.

There is no suggestion in any of these three cases that petitioners were perpetrating a fraud, that they were demeaning themselves in an obnoxious manner, that their activities created any public disturbance or inconvenience, that private rights were contravened, or that the literature distributed was offensive to morals or created any "clear and present danger" to organized society.

The ordinance in each case is sought to be sustained as a system of non-discriminatory taxation of various busi-

nesses, professions, and vocations, including the distribution of books for which contributions are asked, for the sole purpose of raising revenue.[2] Any inclination to take the position that petitioners, who were proselytizing by distributing informative literature setting forth their religious tenets, and whose activities were wholly unrelated to any commercial purposes, were not within the purview of these occupational tax ordinances,[3] is foreclosed by the decisions of the state courts below to the contrary. As so construed, the ordinances, in effect, impose direct taxes on the dissemination of ideas and the distribution of literature, relating to and dealing with religious matters, for which a contribution is asked in an attempt to gain converts, because those were petitioners' activities. Such taxes have been held to violate the Fourteenth Amendment, *McConkey* v. *Fredericksburg*, 179 Va. 556, 19 S. E. 2d 682; *State* v. *Greaves*, 112 Vt. 222, 22 A. 2d 497; *Blue Island* v. *Kozul*, 379 Ill. 511, 41 N. E. 2d 515; and that should be the holding here.[4]

*Freedom of Speech and Freedom of the Press.*

In view of the recent decisions of this Court striking down acts which impair freedom of speech and freedom

[2] Respondent in No. 280 contends that the question presented "in no respect relates to regulatory or police power action of a municipal government, but is concerned only with the municipality's right to levy taxes."

The Supreme Court of Arizona stated in No. 966 that "the ordinance on its face is the ordinary occupational license tax ordinance."

[3] Several courts have taken this position. *State ex rel. Semansky* v. *Stark*, 196 La. 307, 199 So. 129; *People* v. *Finkelstein*, 170 N. Y. Misc. 188, 9 N. Y. S. 2d 941; *Thomas* v. *Atlanta*, 59 Ga. App. 520, 1 S. E. 2d 598; *State* v. *Meredith*, 197 S. C. 351, 15 S. E. 2d 678; *State ex rel. Hough* v. *Woodruff*, 147 Fla. 299, 2 So. 2d 577; *Cincinnati* v. *Mosier*, 61 Ohio App. 81, 22 N. E. 2d 418. Compare, *Gregg* v. *Smith*, 8 L. R. Q. B. (1872–3), p. 302; *Duncan* v. *Gairns*, 27 Canadian Cr. Cases 440; but see *Rex* v. *Stewart*, 53 Canadian Cr. Cases 24.

[4] And see Rutledge, J., dissenting in *Busey* v. *District of Columbia*, 129 F. 2d 24, decided April 15, 1942.

of the press no elaboration on that subject is now necessary. We have "unequivocally held that the streets are proper places for the exercise of the freedom of communicating information and disseminating opinion and that, though the states and municipalities may appropriately regulate the privilege in the public interest, they may not unduly burden or proscribe its employment in these public thoroughfares." *Valentine* v. *Chrestensen, ante,* 52, 54. And as the distribution of pamphlets to spread information and opinion on the streets and from house to house for non-commercial purposes is protected from the prior restraint of censorship, *Lovell* v. *Griffin,* 303 U. S. 444; *Schneider* v. *Irvington,* 308 U. S. 147, so should it be protected from the burden of taxation.

The opinion of the Court holds that the amount of the tax is not before us and that a "nondiscriminatory license fee, presumably appropriate in amount, may be imposed upon these activities." Both of these holdings must be rejected.

Where regulation or infringement of the liberty of discussion and the dissemination of information and opinion are involved, there are special reasons for testing the challenged statute on its face. *Thornhill* v. *Alabama,* 310 U. S. 88, 96–98, and see *Lovell* v. *Griffin,* 303 U. S. 444, 452; *Drivers Union* v. *Meadowmoor Co.,* 312 U. S. 287, 297. That should be done here.[5]

Consideration of the taxes leads to but one conclusion—that they prohibit or seriously hinder the distribution of petitioners' religious literature. The opinion of the Court admits that all the taxes are "substantial." The $25 quar-

---

[5] When the Opelika ordinance is considered on its face, there is an additional reason for its invalidity. The uncontrolled power of revocation lodged with the local authorities is but the converse of the system of prior licensing struck down in *Lovell* v. *Griffin,* 303 U. S. 444. Here, as there, the pervasive threat of censorship inherent in such a power vitiates the ordinance.

terly tax of Casa Grande approaches prohibition. The 1940 population of that town was 1,545. With so few potential purchasers it would take a gifted evangelist, indeed, in view of the antagonism generally encountered by Jehovah's Witnesses, to sell enough tracts at prices ranging from five to twenty-five cents to gross enough to pay the tax. Cf. *McConkey* v. *Fredericksburg*, 179 Va. 556, 19 S. E. 2d 682. While the amount is actually lower in Opelika,[6] and may be lower in Fort Smith in that it is possible to get a license for a short period,[7] and while the circle of purchasers is wider in those towns,[8] these exactions also place a heavy hand on petitioners' activities. The petitioners should not be subjected to such tribute.

But whatever the amount, the taxes are in reality taxes upon the dissemination of religious ideas, a dissemination carried on by the distribution of religious literature for religious reasons alone and not for personal profit. As such they place a burden on freedom of speech, freedom of the press, and the exercise of religion even if the question of amount is laid aside. Liberty of circulation is the very life blood of a free press, cf. *Lovell* v. *Griffin*, 303 U. S. 444, 452, and taxes on the circulation of ideas have a long history of misuse against freedom of thought.[9] See *Grosjean* v. *American Press Co.*, 297 U. S. 233, 245–249. And taxes on circulation solely for the purpose of revenue were success-

---

[6] $5 or $10, depending upon which section of the ordinance is held to apply.

[7] $2.50 per day, $10 per week, and $25 per month.

[8] The 1940 population of Fort Smith was 36,584 and that of Opelika, 8,487.

[9] The English Stamp Act of 1712, 10 Anne, c. 19, put a tax on newspapers and pamphlets to check what seemed to the Government to be "false and scandalous libels" and "the most horrid blasphemies against God and religion." This and subsequent enactments led to a long struggle in England for the repeal of these "taxes on knowledge" and the recognition of the freedom of the press. See Collett, History of the Taxes on Knowledge (1899); Place, Taxes on Knowledge (1831).

fully resisted, prior to the adoption of the First Amendment, as interferences with freedom of the press.[10] Surely all this was familiar knowledge to the framers of the Bill of Rights. We need not shut our eyes to the possibility that use may again be made of such taxes, either by discrimination in enforcement or otherwise, to suppress the unpalatable views of militant minorities such as Jehovah's Witnesses. See *McConkey* v. *Fredericksburg*, 179 Va. 556, 19 S. E. 2d 682. As the evidence excluded in No. 280 tended to show, no attempt was there made to apply the ordinance to ministers functioning in a more orthodox manner than petitioner.

Other objectionable features in addition to the factor of historical misuse exist. There is the unfairness present in any system of flat fee taxation, bearing no relation to the ability to pay. And there is the cumulative burden of many such taxes throughout the municipalities of the land, as the number of recent cases involving such ordinances abundantly demonstrates.[11] The activities of Jehovah's

---

[10] Stamp taxes for purely revenue purposes were successfully resisted in Massachusetts in 1757 and again in 1785 on the ground that they interfered with freedom of the press. See Duniway, Freedom of the Press in Massachusetts (1906), pp. 119–120, 136–137; Thomas, History of Printing in America (1810), vol. 2, pp. 267–268. The press also vigorously opposed the Stamp Act of 1765, 5 Geo. III, c. 12, which was also a revenue measure. See Duniway, *op. cit.*, p. 124; Thomas, *op. cit.*, pp. 189, 297, 322, 329, 350; Van Tyne, Causes of the War of Independence (1922), p. 160; 15 Scottish Historical Review 322, 326.

[11] In addition to the instant cases, see *Cincinnati* v. *Mosier*, 61 Ohio App. 81, 22 N. E. 2d 418; *State* v. *Meredith*, 197 S. C. 351, 15 S. E. 2d 678; *Thomas* v. *Atlanta*, 59 Ga. App. 520, 1 S. E. 2d 598; *Commonwealth* v. *Reid*, 144 Pa. Super. 569, 20 A. 2d 841; *People* v. *Banks*, 168 N. Y. Misc. 515, 6 N. Y. S. 2d 41; *Cook* v. *Harrison*, 180 Ark. 546, 21 S. W. 2d 966; *State* v. *Greaves*, 112 Vt. 222, 22 A. 2d 497; *Busey* v. *District of Columbia*, 129 F. 2d 24; *McConkey* v. *Fredericksburg*, 179 Va. 556, 19 S. E. 2d 682; *Blue Island* v. *Kozul*, 379 Ill. 511, 41 N. E. 2d 515; *State ex rel. Semansky* v. *Stark*, 196 La. 307, 199 So. 129; *People* v. *Finkelstein*, 170 N. Y. Misc. 188, 9 N. Y. S. 2d 941; *State ex rel.*

Witnesses are widespread, and the aggregate effect of numerous exactions, no matter how small, can conceivably force them to choose between refraining from attempting to recoup part of the cost of their literature, or else paying out large sums in taxes. Either choice hinders and may even possibly put an end to their activities. There is no basis, other than a refusal to consider the characteristics of taxes such as these, for any assumption that such taxes are "commensurate with the activities licensed." Nor is there any assurance that "a correlatively enlarged field of distribution" will insure sufficient proceeds even to meet such exactions, let alone leaving any residue for the continuation of petitioners' evangelization.

Freedom of speech, freedom of the press, and freedom of religion all have a double aspect—freedom of thought and freedom of action. Freedom to think is absolute of its own nature; the most tyrannical government is powerless to control the inward workings of the mind. But even an aggressive mind is of no missionary value unless there is freedom of action, freedom to communicate its message to others by speech and writing. Since in any form of action there is a possibility of collision with the rights of others, there can be no doubt that this freedom to act is not absolute but qualified, being subject to regulation in the public interest which does not unduly infringe the right. However, there is no assertion here that the ordinances were regulatory, but if there were such a claim, they still should not be sustained. No abuses justifying regulation are advanced and the ordinances are not narrowly and precisely drawn to deal with actual, or even hypothetical, evils, while at the same time preserving the substance of the right. Cf. *Thornhill* v. *Alabama,* 310 U. S.

*Hough* v. *Woodruff,* 147 Fla. 299, 2 So. 2d 577; *Borchert* v. *Ranger,* 42 F. Supp. 577.

88, 105; *Cantwell* v. *Connecticut,* 310 U. S. 296, 311. They impose a tax on the dissemination of information and opinion anywhere within the city limits, whether on the streets or from house to house. "As we have said, the streets are natural and proper places for the dissemination of information and opinion; and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised elsewhere." *Schneider* v. *Irvington,* 308 U. S. 147, 163. These taxes abridge that liberty.

It matters not that petitioners asked contributions for their literature. Freedom of speech and freedom of the press cannot and must not mean freedom only for those who can distribute their broadsides without charge. There may be others with messages more vital but purses less full, who must seek some reimbursement for their outlay or else forego passing on their ideas. The pamphlet, an historic weapon against oppression,[12] *Lovell* v. *Griffin,* 303 U. S. 444, 452, is today the convenient vehicle of those with limited resources because newspaper space and radio time are expensive and the cost of establishing such enterprises great. If freedom of speech and freedom of the press are to have any concrete meaning, people seeking to distribute information and opinion, to the end only that others shall have the benefit thereof, should not be taxed for circulating such matter. It is unnecessary to consider now the validity of such taxes on commercial enterprises engaged in the dissemination of ideas. Cf. *Valentine* v. *Chrestensen, ante,* p. 52; *Giragi* v. *Moore,* 301 U. S. 670. Petitioners were not engaged in a traffic for profit. While the courts below held their activities were covered by the

---

[12] The pamphlets of Paine were not distributed gratuitously. See Introduction to Paine's Political Writings (London, 1909) pp. 3, 5.

Pamphlets were extensively used in the struggle for religious freedom. See Greene, The Development of Religious Liberty in Connecticut (1905), pp. 282–283, 299–301.

ordinances, it is clear that they were seeking only to further their religious convictions by preaching the gospel to others.

The exercise, without commercial motives, of freedom of speech, freedom of the press, or freedom of worship are not proper sources of taxation for general revenue purposes. In dealing with a permissible regulation of these freedoms and the fee charged in connection therewith, we emphasized the fact that the fee "was not a revenue tax, but one to meet the expense incident to the administration of the Act and to the maintenance of public order," and stated only that, "There is nothing contrary to the Constitution in the charge of a fee limited to the purpose stated." *Cox* v. *New Hampshire,* 312 U. S. 569, 577. The taxes here involved are ostensibly for revenue purposes; they are not regulatory fees. Respondents do not show that the instant activities of Jehovah's Witnesses create special problems causing a drain on the municipal coffers, or that these taxes are commensurate with any expenses entailed by the presence of the Witnesses. In the absence of such a showing, I think no tax whatever can be levied on petitioners' activities in distributing their literature or disseminating their ideas. If the guaranties of freedom of speech and freedom of the press are to be preserved, municipalities should not be free to raise general revenue by taxes on the circulation of information and opinion in non-commercial causes; other sources can be found, the taxation of which will not choke off ideas. Taxes such as the instant ones violate petitioners' right to freedom of speech and freedom of the press, protected against state invasion by the Fourteenth Amendment.

### *Freedom of Religion.*

Under the foregoing discussion of freedom of speech and freedom of the press, any person would be exempt from taxation upon the act of distributing information or

opinion of any kind, whether political, scientific, or religious in character, when done solely in an effort to spread knowledge and ideas, with no thought of commercial gain. But there is another, and perhaps more precious, reason why these ordinances cannot constitutionally apply to petitioners. Important as free speech and a free press are to a free government and a free citizenry, there is a right even more dear to many individuals—the right to worship their Maker according to their needs and the dictates of their souls and to carry their message or their gospel to every living creature. These ordinances infringe that right, which is also protected by the Fourteenth Amendment. *Cantwell* v. *Connecticut,* 310 U. S. 296.

Petitioners were itinerant ministers going through the streets and from house to house in different communities, preaching the gospel by distributing booklets and pamphlets setting forth their views of the Bible and the tenets of their faith. While perhaps not so orthodox as the oral sermon, the use of religious books is an old, recognized and effective mode of worship and means of proselytizing.[13] For this, petitioners were taxed. The mind rebels at the thought that a minister of any of the old established churches could be made to pay fees to the community before entering the pulpit. These taxes on petitioners' efforts to preach the "news of the Kingdom" should be struck down because they burden petitioners' right to worship the Deity in their own fashion and to spread the gospel as they understand it. There is here no contention that their manner of worship gives rise to conduct which calls for regulation, and these ordinances are not aimed at any such practices.

One need only read the decisions of this and other courts in the past few years to see the unpopularity of Jehovah's

---

[13] See, The Volumes of the American Tract Society (1848), pp. 15–16, 24; Home Evangelization (1850), pp. 70–74; Lee, History of the Methodists (1810), p. 48.

Witnesses and the difficulties put in their path because of their religious beliefs. An arresting parallel exists between the troubles of Jehovah's Witnesses and the struggles of various dissentient groups in the American colonies for religious liberty which culminated in the Virginia Statute for Religious Freedom,[14] the Northwest Ordinance of 1787,[15] and the First Amendment. In most of the colonies there was an established church, and the way of the dissenter was hard. All sects, including Quaker, Methodist, Baptist, Episcopalian, Separatist, Rogerine, and Catholic, suffered.[16] Many of the non-conforming ministers were itinerants, and measures were adopted to curb their unwanted activities. The books of certain denominations were banned.[17] Virginia and Connecticut had burdensome licensing requirements.[18] Cf. *Lovell* v. *Griffin*, 303 U. S. 444; *Schneider* v. *Irvington*, 308 U. S. 147; *Cantwell* v. *Connecticut*, 310 U. S. 296. Other states required oaths before one could preach which many ministers could not conscientiously take.[19] Cf. *Reid* v. *Brookville*, 39 F. Supp. 30;

---

[14] Adopted in 1785 through the efforts of Jefferson and Madison. Virginia Code of 1930, § 34.

[15] ARTICLE I. No person demeaning himself in a peaceable and orderly manner shall ever be molested on account of his mode of worship or religious sentiments in the said territory.

[16] See Works of Thomas Jefferson (1861), vol. VIII, pp. 398–402 (Notes on Virginia, Query XVII); Cobb, Rise of Religious Liberty in America (1902); Little, Imprisoned Preachers and Religious Liberty in Virginia (1938); Lee, History of the Methodists (1810), pp. 62–74; Greene, The Development of Religious Liberty in Connecticut (1905), pp. 158–180; Guilday, Life and Times of John Carroll (1922), vol. 1, Chapters V and VIII.

[17] Jefferson, *op. cit.;* Greene, *op. cit.*, p. 165.

[18] Little, *op. cit.*, pp. 11–13, 67–69; Greene, *op. cit.*, pp. 243, 262–263, 358; Cobb, *op. cit.*, pp. 98, 104, 358; Wright, Hawkers and Walkers in Early America (1927), Chapter X; Baldwin, The New England Clergy and the Revolution (1928), p. 59.

[19] The Journal of the Rev. Francis Asbury (1821), vol. 1, pp. 208, 253; Lee, *op. cit.*, pp. 62–74.

*Kennedy* v. *Moscow*, 39 F. Supp. 26. Research reveals no attempt to control or persecute by the more subtle means of taxing the function of preaching, or even any attempt to tap it as a source of revenue.[20]

By applying these occupational taxes to petitioners' non-commercial activities, respondents now tax sincere efforts to spread religious beliefs, and a heavy burden falls upon a new set of itinerant zealots, the Witnesses. That burden should not be allowed to stand, especially if, as the excluded testimony in No. 280 indicates, the accepted clergymen of the town can take to their pulpits and distribute their literature without the impact of taxation. Liberty of conscience is too full of meaning for the individuals in this Nation to permit taxation to prohibit or substantially impair the spread of religious ideas, even though they are controversial and run counter to the established notions of a community. If this Court is to err in evaluating claims that freedom of speech, freedom of the press, and freedom of religion have been invaded, far better that it err in being overprotective of these precious rights.

MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS, MR. JUSTICE MURPHY:

The opinion of the Court sanctions a device which in our opinion suppresses or tends to suppress the free exercise of a religion practiced by a minority group. This is but another step in the direction which *Minersville School District* v. *Gobitis*, 310 U. S. 586, took against the same religious minority, and is a logical extension of the principles upon which that decision rested. Since we joined in the opinion in the *Gobitis* case, we think this is an ap-

---

[20] The Stamp Act of 1765 exempted "any books containing only matters of devotion or piety." MacDonald, Documentary Source Book of American History (3d ed., 1934), p. 128.

propriate occasion to state that we now believe that it also was wrongly decided. Certainly our democratic form of government, functioning under the historic Bill of Rights, has a high responsibility to accommodate itself to the religious views of minorities, however unpopular and unorthodox those views may be. The First Amendment does not put the right freely to exercise religion in a subordinate position. We fear, however, that the opinions in these and in the *Gobitis* case do exactly that.